MAXWELL, J.,
for the Court:
¶ 1, Evidence that a criminal defendant attempted to intimidate a witness into not testifying against him is an incriminating circumstance, tending to show a guilty conscience.[1] For this reason, we find no error in the trial court admitting evidence that William Jordan and his codefendant, Charles Henderson, threatened the two eyewitnesses to Jordan’s murder of Aaron *839 Coleman by participating in a rap video about killing snitches-a video published on YouTube after the two witnesses had implicated Jordan and Henderson but before Jordan’s trial commenced.
¶ 2. Nor do we find any error in the trial court’s refusal, at the end of trial, to give a cautionary instruction about accomplice testimony. The two eyewitnesses had been charged as accessories after the fact, not accomplices. So no accomplice instruction was required. The jury was instead permitted to weigh their credibility against Jordan’s and other defense witnesses’ as they saw fit. The jury did just that and, after deliberating, found Jordan guilty of depraved-heart murder and felon in possession of a firearm.
¶ 3. Because this verdict was supported by sufficient evidence and was not against the overwhelming weight of the evidence, we affirm Jordan’s conviction and sentence.
Background Facts and Procedural History

I. Investigation

¶ 4. Late in February 2012, Coleman’s mother reported him missing. Coleman’s car was soon found outside of Meridian. But several more days passed before Coleman’s body was discovered in the woods near Interstate 20.
¶ 5. Coleman was last seen alive on February 27 at Jordan’s house. When questioned, Jordan confirmed Coleman had stopped by that day. But Jordan told the Meridian Police that Coleman had only stayed a few minutes. After that, Jordan supposedly never saw him again. Charlie Henderson and Bobby Baker—longtime friends of both Coleman and Jordan—had also been at Jordan’s house that evening. And they gave similar stories to the police.
¶ 6. The police were told they should also question JaMichael Smith, because he had been at Jordan’s house that night too. But Smith quickly left Meridian late that night on a Greyhound bus headed for Michigan. A year later, Smith was extradited from Michigan to Mississippi, where he finally told the police his version of what happened.

A. Smith’s Account

¶ 7. While Smith had grown up in Meridian, he moved to Michigan when he was seventeen. For five years he stayed away. But he returned to Meridian in February 2012 for his grandfather’s funeral. He ended up at Jordan’s house on February 27, drinking and smoking marijuana. According to Smith, everyone seemed to be having a good time when Jordan went to his bedroom and retrieved a shotgun. Jordan returned to the living room, where both Henderson and Coleman were. Jordan began waving the gun around. Smith got nervous, so he went into the kitchen. Smith heard the gun go off. He saw Coleman bent over in the corner of the living room. Smith ran out the back door of Jordan’s house and took the first bus out of town.

B. Baker’s Account

¶ 8. Once Smith was in custody in Mississippi, Baker came forward too. He admitted he had initially lied to investigators when he denied knowing what happened to Coleman. The truth, according to Baker, was that he too was in Jordan’s living room, drinking and smoking marijuana, when Jordan shot Coleman.
¶ 9. Coleman claimed he had received a phone call from his mother, saying it was time to come home. Henderson started teasing Coleman about having a curfew. This is when Jordan retrieved the shotgun. Like Smith, Baker was worried about the gun, so he kept his eyes on Jordan. He saw the gun go off, Henderson lunge, and *840 Coleman—-who was standing right behind Henderson—get shot in the stomach.
¶ 10. Coleman fell over, but he was still breathing. Baker wanted to call for an ambulance. But Jordan pointed the gun at him and told him to stop. Baker tried to reason with Jordan, saying everyone would see it was an accident and that Jordan did not know the gun was loaded. So with Coleman still alive, Baker started to call 911. But Henderson told him to hang up. Baker saw Smith run out the back door.
¶ 11. About ten minutes went by. Coleman was still alive, and Jordan and Henderson were trying to figure out what to do. They finally told Baker to help them load Coleman into the back of Jordan’s Honda. Baker got into the backseat with Coleman. Jordan and Henderson stayed outside the car, further devising a plan. Another five minutes passed. And Coleman suddenly stopped breathing and his whole body stopped moving. Henderson opened the door and saw that Coleman had died.
¶ 12. At this point, Jordan’s live-in girlfriend pulled up in her car. Henderson quickly shut the car door to conceal Coleman’s body. Jordan followed his girlfriend into his house for a few minutes, while Henderson rifled through Coleman’s pockets and found his keys. Baker testified that Henderson then pulled out a pah- of gloves. When Jordan exited his house again, Jordan got into the driver’s seat of his car. Henderson, gloves on, then took Coleman’s keys and got into Coleman’s car. The two cars started driving around Meridian. The whole time Jordan and Henderson were on their cell phones fay-ing to figure out what to do. Jordan eventually turned onto 1-20 but ran out of gas. He veered over to the shoulder and waited for Henderson to bring him more fuel.
¶ 13. When Henderson pulled up behind them with a gas can fifteen minutes later, he was surprised Coleman’s body was still in the backseat. Baker and Jordan then lifted the body out of the car and rolled it down an embankment, where it was found days later. The two cars then drove off down the interstate. They took a nearby exit, where they dumped Coleman’s car.
¶ 14. The three then drove to Henderson’s house in Jordan’s car. There, a fourth man came out with a metal barrel and started a fire. Baker testified he, Jordan, and Henderson threw their clothes into the fire, along with Coleman’s cell phone and wallet.

C. Indictment

¶ 15. Jordan was indicted for second-degree murder. See Miss.Code Ann. § 97—3—19(1)(b) (Rev.2014). He was also charged with felon in possession of a firearm. See Miss.Code Ann. § 97-37-5 (Rev. 2014).
¶ 16. Henderson and Baker were indicted as accessories after the fact to the murder, for their role in dumping Coleman’s body. Smith too was indicted as an accessory after the fact, because he knew Jordan had killed Coleman but did not come forward until almost a year later. See Miss.Code Ann. § 97-1-5 (Rev.2014) (punishing “[e]very person ... convicted of having concealed, received, or relieved any felon, or having aided or assisted any felon, knowing that the person had committed a felony, with intent to enable the felon to escape or to avoid arrest, trial, conviction or punishment after the commission of the felony”).

II. Trial

¶ 17. Jordan and Henderson were set *841 to be tried together.[2] But the morning of trial, after the jury was selected, Henderson moved for severance. Apparently, Jordan had subpoenaed Henderson as a defense witness, and to avoid issues with Henderson asserting his Fifth Amendment right against self-incrimination in response to certain questions by Jordan in the joint trial, the judge granted Henderson’s motion. And Jordan was tried separately.
¶ 18. During Jordan’s trial, Smith and Baker testified for the State, but Jordan ultimately decided not to call Henderson to testify. Jordan, however, took the stand and testified in his own defense. Jordan stuck to his original story—that while he, Coleman, Henderson, and Baker had all been at his house on February 27, Coleman left after a few minutes. Jordan’s girlfriend also testified. She said he had come home at 3 p.m. that day. While Henderson and Baker were there with Jordan, she insisted Coleman had never come by that day. Nor did Jordan ever leave with Henderson and Baker.
¶ 19. No physical evidence was offered. The Meridian police officer who was investigating the disappearance of Coleman had gone to Jordan’s home to question him. But not yet realizing Jordan’s house was the crime scene, the officer did not search the house. By the time Smith and Baker had given their statements to the police, Jordan and his girlfriend had moved out of the house, which had been cleaned after they vacated it. Jordan had also gotten rid of his Honda. The medical examiner testified that, due to the close range of the shotgun, all the shot from the blast hit Coleman. None of the pellets would have scattered around the room. And neither the shotgun shell casing nor the gun was ever recovered. While a forensic team dusted Coleman’s car for prints, the only ones they found belonged to Coleman.
¶20. At the close of trial, Jordan’s counsel requested an alibi instruction and a cautionary instruction about accomplice testimony. Both were refused.
¶21. The jury found Jordan guilty of murder and felon in possession of a firearm. After the court denied his motion for a judgment notwithstanding the verdict or, alternatively, a new trial, Jordan appealed.
Discussion

I. YouTube Video

¶ 22. Jordan’s first issue on appeal surrounds the admission of rap video, published on YouTube.
¶ 23. Jordan appears in the video. But the main performer in the video is Henderson—who was also implicated by Smith and Baker and was charged as an accessory after the fact to Coleman’s murder. Shortly after the video begins, there is a close-up shot of Jordan’s face. The scene then turns to his codefendant, Henderson, who begins rapping, “used to be my homeboy—used to be. Asked him why he flipped on me.” The rap proceeds to question how a life-long friend could turn State’s evidence. Henderson repeatedly warned that when “it’s your turn, you gonna burn.” While Jordan does not rap in the video, at one point he can be seen singing along with the chorus, waving his middle finger and making other hand motions that go along with the words.
¶24. The rap song is followed by a scene featuring Henderson but not Jordan. In this segment, an unidentified man walks up to Henderson and his circle of friends. *842 The group chases the man into the woods. Henderson then tells the man, “You already know,” and repeatedly asks him, “How you kill a snake?” Henderson then pulls a handgun on the man. The video ends with Henderson pointing the gun directly at the camera. The screen goes blank and a gunshot rings out.
¶ 25. The trial judge admitted the video, over Jordan’s objection. While he now raises multiple claims against admission'on appeal, at trial Jordan asserted only two reasons why the video should not be admitted: (1) the video had not been properly authenticated, and (2) the video was not relevant. Because “[i]t is well-settled law that one cannot offer and argue on appeal a different basis than what was offered at trial in objecting to admission of evidence,” we limit our review to the two bases Jordan offered prior to the video’s admission. Platt v. State, 151 So.3d 236, 241 (¶ 16) (Miss.Ct.App.2014).
¶26. We review the trial court’s decision to admit the video for abuse of discretion. Id. at 240 (¶ 14). And after delving into Jordan’s claims that the video had not been properly authenticated and had no relevance, we find no abuse.

A. Relevance

¶ 27. We begin with the video’s relevance. “Generally speaking, all evidence introduced in a criminal prosecution must be relevant to the guilt or innocenc$ of the accused[.]” Mattox v. State, 243 Miss. 402, 413, 137 So.2d 920, 923 (1962); see also M.R.E. 402 (“Evidence which is not relevant is not admissible.”). “[B]ut that rule is not violated by the admission of evidence that [the] accused attempted to suppress evidence against himself.” Mattox, 243 Miss. at 413, 137 So.2d at 923. This is because evidence of a defendant’s attempt to keep a witness from testifying has “probative value as an incriminating circumstance inconsistent with [the defendant’s] innocence[,] and as tending to show a consciousness of guilt and that his cause lacked honesty and truth.” Id. Thus, this type of evidence is admissible as part of the State’s case-in-chief. Id.
¶ 28. The State introduced the rap video about retribution against snitches as evidence that Jordan tried to keep Smith and Baker from testifying. The video was posted on YouTube after Smith and Baker had given statements incriminating Jordan and Henderson. Smith gave his statement identifying Jordan as the gunman on April 3, 2012, and Baker implicated Jordan and Henderson on June 15, 2012. The video was posted on YouTube on April 9, 2013, while Jordan and Henderson were awaiting trial. Jordan’s case was severed and began on February 3, 2014. So obviously, at the time the video was posted Smith and Baker had already cooperated with law enforcement but had not yet testified.
¶ 29. Later, during trial, Smith and Baker both confirmed they felt threatened by the video. Smith said after watching the video, “I really wanted to give up. I didn’t want to deal with none of this no more. I just wanted to be—it came to a point in time where I actually—I wanted to kill over myself .... ” During Baker’s testimony, the State pressed him about why he withheld the truth about what happened to Coleman for so long, considering how close a friend he had been to Coleman. Baker admitted part of the reason was that he feared retribution from Jordan and Henderson. While Baker could háve left town, his mother would still be in Meridian. When he learned about the YouTube video, Baker said he felt threatened and called his attorney, who notified the police. Because Jordan’s willing participation in the video was probative of witness intimidation, or as our supreme court has put it, “evidence showing a con *843 science of guilt and that his cause lacked honesty!,]” the video was relevant evidence, which the jury was permitted to consider. See id.
¶ 30. On appeal, Jordan argues any probative value the video may have had was outweighed by the danger of unfair prejudice. See M.R.E. 403 (“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice!.]”). Jordan asserts the judge erred by admitting the video without first conducting ah on-the-record Rule 403 balancing test, which he claims was necessary because the video was admitted over and against Mississippi Rule of Evidence 404(b). But pri- or to the video’s admission, Jordan never asserted the video’s introduction would violate Rule 404(b), which makes evidence of other wrongs inadmissible to show the defendant’s bad character. See M.R.E. 404(b). A Rule 404(b) objection, even if overruled, would have triggered a Rule 403 balancing test. Johnson v. State, 44 So.3d 1040, 1045 (¶ 19) (Miss.Ct.App.2010) (citation omitted). But here, there was no objection on this basis. So we find no error in the trial court’s “failure” to ensure the danger of unfair prejudice substantially outweighed the probative value of the video before allowing the video’s admittance.[3]
¶ 31. In United States v. Begay, the Ninth Circuit was faced with the same argument on appeal—“that evidence showing that [the defendant] sought to intimidate the witnesses against him was inadmissible under Federal Rules of Evidence 403 and 404(b).” United States v. Begay, 673 F.3d 1038, 1046 (9th Cir.2011). Like Jordan, the defendant in Begay had not asserted at trial that such evidence violated Rules 404(b) and 403, Id. Applying the plain-error doctrine, the Ninth Circuit found no error. “First, the evidence in question was admissible to show [the defendant’s] consciousness of guilt.” Id. (citing Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir.1996)). “Second, its probative value outweighed any danger of unfair prejudice because the evidence also tended to explain why [the witnesses] delayed coming forward to investigators[.]” Id.
¶ 32. Likewise we find no plain error. Contrary to Jordan’s insistence, the State did not merely introduce the video as bad-character evidence. Rather, the video was evidence that Jordan tried to prevent Smith and Baker from testifying. Indeed, the second verse of the rap contains the lyrics, “Ain’t goin’ to say nobody’s name. You know all of em’s to blame.... You a jerk. Your kind the kind to get ‘murk’[4] for saying foolish shit.” And in verse three, “Ain’t goin’ say you took the *844 stand, you cracked before you made it.... He's been a bitch since he was five. Y’all won't make it in these woods, y'all yoin’ to eat your words alive.” (Emphasis added). So the video’s threatening nature was “probative evidence” of Jordan’s guilt. Mattox, 243 Miss. at 413, 137 So.2d at 923; see also State v. Wilson, 171 So.3d 356, 365 (La.Ct.App.2015) (finding “[ejvidence of attempts by a defendant to intimidate witnesses for the State has substantial probative value ” (emphasis added)). After review, we do not find its probative value was so outweighed by potential unfair prejudice as to warrant reversal. “The offensiveness of threatening personal harm to a witness ... implies a knowledge and fear of particular and damaging testimony intimately related to the prosecution at hand[.]” United States v. Monahan, 633 F.2d 984, 984 (1st Cir.1980) (per curiam). “Because [such] evidence implicated no irrelevant or collateral matters”—but instead was relevant to show consciousness of guilt[5]—“any ‘prejudice’ that arose did so only because of the evidence’s probative character.” Id. And “Rule 403 is not contravened by evidence that might show only that the defendant is guilty of the crime charged.” Id.
¶ 33. We comment briefly on the dissent’s lengthy description of its personal feelings about the video’s probative nature. What is clear is that the dissent views the video, not for the reason it was admitted— evidence of witness intimidation—but through its own interpretation. From hypothesizing about the video’s “splices” and “dub overs” to citing articles about “the spectacularly common themes in rap music,” the dissent injects quite a bit of speculation.
¶ 34. But lost in this fray is the reality that the murder charge against Jordan was not a fiction or generalization of the rap industry—it was fact. And the video was not an innocuous offering performed by some far-away artist or unknown person. It was local and starred Jordan’s charged codefendant, Henderson, as the main rapper in the video. And Jordan— who at the time was under indictment with Henderson and awaiting trial for murder— willingly participated and appeared in it. Another undeniable truth is that even Jordan concedes the video was about killing snitches. And the evidence at trial showed the video was only published to YouTube after Jordan and his codefendant and co-rapper, Henderson, got wind that Baker and Smith had implicated them in the murder and coverup.
¶ 35. Though the dissent might believe it is practically cliche in the rap world for codefendants awaiting their murder and coverup trial to voluntarily participate in a video about killing cooperating witnesses before they can take the stand, the real-life cooperators here, Baker and Smith, did not. And they, not the dissent, have actually known Jordan and Henderson since childhood. So we find them in the better position to appreciate what these taped warnings meant. Indeed, even the dissent must concede that the video’s so-called “narrator” boasts that the unnamed snitch will know whom the threat is directed towards. And both Baker and Smith believed the threat was real and pointed at them.
*845 ¶ 36. We thus find the video probative for the same reason the trial judge (and obviously Baker and Smith) did, because it was aimed at intimidating these witnesses' into not testifying.

B. Authentication

¶37. Still, before relevant evidence is admitted, it must be authenticated. M.R.E. 901(a). “One means to authenticate evidence is through the testimony of a witness with knowledge ‘that a matter is what it is claimed to be.’ ” Riley v. State, 126 So.3d 1007, 1009 (¶ 7) (Miss.Ct.App.2013) (quoting M.R.E. 901(b)(1)).

1. Knight’s Knowledge

¶ 38. The State claimed the video was a rap video published on YouTube before Jordan’s trial, featuring Henderson and Jordan. Before admitting the video, the State questioned Danny Knight, an investigator with the Mississippi Bureau of Investigations. Knight joined the Meridian Police Department’s investigation of Coleman’s death once the case went cold. Knight was the investigator who obtained the statement from Smith about what happened the night of Coleman’s death. And Baker finally came clean to Knight and admitted he had been covering for Jordan for months. The State asked Knight if Smith and Baker had given him any reason why they had been hesitant to contact the police. Knight responded that Baker’s counsel had alerted him to a threatening video on YouTube. Knight himself went to YouTube and found the video. From his involvement in the investigation, he recognized Jordan and Henderson in the video. Because of what the video dépict-ed, he agreed with Baker’s counsel—the video was meant as a threat. Knight testified he participated in the process of downloading a copy of the video onto a compact disc. And he verified the State had brought the same disc to court that day. Based on his testimony, we find Knight had sufficient knowledge to authenticate that the video was what the State claimed it to be—a video published on YouTube featuring Jordan and Henderson. See M.R.E. 901(b)(1).
¶ 39. Jordan suggests that Knight’s knowledge was insufficient because he did not know when the video was made, who produced it, or when it was published on the internet. But we are of the same mind as the California Court of Appeals, which found similar challenges to a YouTube video went to the issues of the reliability and weight of the video, not its authentication. People v. Torres, 2012 WL 1205808, at *4 (Cal.Ct.App. Apr. 11, 2012) (unpublished). Jordan himself confirmed he had been a trilling participant in the video. And the scenes he was in were shot in Henderson’s home. But Jordan also testified he did not write or rap the song in the video and was not part of the final scene in which Henderson chases a man into the woods and shoots him. We find it was up to the jury to decide what weight, if any, to’ give the video, in' light of Jordan’s testimony.

2. Knight’s Comments

¶ 40. That said, we are concerned that Knight, in trying to lay the proper foundation for the video, may have overstepped his bounds. When first asked about the video, Knight said it contained a “reenactment ... of the killing of Aaron Coleman.” Even the State concedes this was a mistake. Knight later testified, “in [his] opinion,” that the final scene depicts getting a witness, “which is Mr. Baker,” into the woods and killing him for turning. While this description is more objectively accurate, it was still “based on nothing beyond [Knight’s] own inspection of the contents of the video”—and not his firsthand knowledge. Pulliam v. State, 873 So.2d 124, 127 (¶ 18) (Miss.Ct.App.2004) (finding an eyewitness’s narration of a video not only permissible but helpful to the *846 jury). Still, when weighed against the overall evidence, we find Knight’s narration to be harmless. See McClendon v. State, 124 So.3d 709, 714 (¶ 11) (Miss.Ct.App.2013) (citing Veasley v. State, 735 So.2d 432, 437 (¶ 17) (Miss.1999)) (finding harmless error because “the weight of the overall evidence against [the defendant] heavily outweigh[ed] the harm done by allowing the officer’s [hearsay] testimony”). The lyrics and visuals of the video are so pointed that no reasonable juror could interpret the video to be about anything other than retribution against a lifelong friend that turned State’s evidence. Even Jordan, when questioned on cross-examination, conceded as much. He just denied that friend was Baker, instead claiming Henderson wrote the song about someone else. Further, the video was posted on YouTube after Smith and Baker had implicated Jordan and Henderson but before they had taken the stand and testified against Jordan at his trial. And both Smith and Baker testified they understood the video to be a direct threat to them— Smith to the point he contemplated suicide and Baker to the point he had his lawyer alert the authorities. Thus, we find Knight’s comments, though improper, do not warrant reversal.
¶41. But we are not as concerned with Knight’s comments about Smith, Baker, and. Jordan’s statements, as Knight was relaying the events leading to all three men’s arrests. On appeal, Jordan cites Rose v. State, 556 So,2d 728 (Miss.1990), to argue “Knight’s testimony essentially instructed the jury that Baker and Smith’s testimony was true and Defendant Jordan was guilty of murder.” But Knight’s testimony was not akin to the investigator’s improper lay-opinion testimony in Rose. There, the investigator testified he had conducted “hundreds” of interviews of codefendants to the same crime and it was not unusual for there to be inconsistencies among their statements. Id. at 731. In fact, the investigator 'opined, it would have been unusual if there were no discrepancies in the statements. Id. at 731-32. On appeal, the supreme court found “[t]he lay opinion testimony of [the officer] was inadmissible,” because “[h]e, in essence, told the jury that they were to believe the stories of the three codefendants, despite discrepancies among their accounts of the theft[.]” Id. at 733.
¶ 42. Here, Knight was not improperly giving lay opinion about the truthfulness of Smith, Baker, or Jordan. Instead, he was testifying about matters within his personal observation—namely, why the investigation of Coleman’s death heated up and pivoted toward Jordan, after almost a year had gone by. After explaining the difficulty in getting a statement from Smith, Knight testified Smith had provided a credible lead, because what he told investigators fit with other aspects of their investigation. Knight pointed out how Smith’s version actually matched Jordan’s in that both placed Jordan, Smith, Henderson, Baker, and Coleman at Jordan’s house that day. And after Smith began talking, Baker came forward and also implicated Jordan, and his more-recent version coincided with much of Smith’s description of events. From this, in contrast to Rose, we find no attempt to explain away discrepancies -in Smith and Baker’s statements. Nor did Knight suggest the jury should essentially overlook them. Rather, Knight, in explaining how the investigation unfolded, simply pointed out the same evi-dentiary conflict facing the jury—that Jordan, Smith, and Baker all said they were at Jordan’s house and so was Coleman. But according to Jordan, Coleman left alive. And according to Smith and Baker, Coleman did not.
*847 ¶ 43. As the supreme court said in Rose, “A defendant must be allowed to point out discrepancies in witnesses’ accounts of events, and to have the jury determine whether those witnesses are truthful.” Id. And here, we find no prejudice to that right arising from Knight’s testimony.

II. Jury Instructions

A. Alibi

¶ 44. Next, Jordan argues the trial court should have instructed the jury on his alibi defense theory. It is certainly true that, “[w]hen a defendant asserts the defense of alibi, and presents testimony in support of that defense, the defendant is entitled to a jury instruction focusing upon such ,a theory.” Cochran v. State, 913 So.2d 371, 375 (¶ 14) (Miss.Ct.App.2005). But here, we agree with the trial court that Jordan’s defense theory was not alibi.
¶45. Black’s Law Dictionary defines “alibi” as “[a] defense based on the physical impossibility of a defendant’s guilt by placing the defendant in a location other than the scene of the crime at the relevant time.” Black’s Law Dictionary 79 (8th ed.2004) (emphasis added). And even Jordan’s proposed instruction defined “alibi” as “elsewhere or in another place.” But Jordan’s proposed instruction says Jordan’s alibi was that “he was home with his [girlfriend] and did not shoot and dispose of the body of Aaron Coleman.” According to the State’s case, the scene of the shooting was Jordan’s home. So Jordan’s defense did not place him in a location other than the scene of the crime.
¶ 46. As we said in Owens v. State, when, based on the defendant’s claimed location, “it would remain within the realm of physical possibility for the defendant to have committed the crime, then the defense is nothing more than a denial and would not rise to the level of alibi.” Owens v. State, 809 So.2d 744, 747 (¶ 7) (Miss.Ct.App.2002). And here, Jordan said he was at his house on February 27. So it would have certainly been physically possible to shoot Coleman in his living room. Thus, his claim that Coleman was not shot in his living room—but instead left Jordan’s home alive earlier that day—is a denial, not an alibi. For this reason, we find the trial court did not abuse its discretion by refusing to give Jordan’s alibi instruction.

B. Accomplice Testimony

¶ 47. Nor do we find the trial court abuse its discretion when it denied Jordan’s proposed cautionary instruction about accomplice testimony. “The decision to give an accomplice instruction is within the trial court’s discretion.” Hye v. State, 162 So.3d 818, 823 (¶ 16) (Miss.Ct.App.2013) (citing Burke v. State, 576 So.2d 1239, 1242 (Miss.1991)). We find no abuse here, because Smith and Baker were never charged with being accomplices. Instead, they were both charged as accessories after the fact. See id. (finding the trial court was within its discretion to deny an instruction on accomplice testimony because the witness, to whom the instruction was directed, was convicted as an accessory after the fact, not an accomplice).
¶48. This court was confronted with the same scenario in Bailey v. State, 960 So.2d 583, 591 (¶¶ 35-37) (Miss.Ct.App.2007). In Bailey, the defendant proposed á cautionary instruction about accomplice testimony. Id. at (¶ 35). But when the State pointed out the witness in question had been convicted as an accessory after the fact and did not meet the definition of an accomplice, the trial court denied the instruction. Id. at (¶ 36).
¶49. This court affirmed on appeal. An accomplice is “a person who is implicated in the commission of the crime.” Id. at *848 590 (¶ 30) (quoting Slaughter v. State, 815 So.2d 1122, 1134 (¶ 66) (Miss.2002)). “On the other hand, an accessory-after-the-fact has been defined as ‘a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc.’ ” Id. (quoting Chase v. State, 645 So.2d 829, 851 (Miss.1994)). The witness in Bailey “was the lookout during the burial of the victim, she helped Bailey clean his bloody body, she saw [the victim] lying dead by her truck[,] and she kept quiet about the murder for more than a year until she was confronted by police.” Id. at (¶ 37). Thus, she was an accessory after the fact, not an accomplice, meaning “[n]o accomplice instruction was needed.” Id.
¶ 50. Here, Baker was never implicated in the murder. Baker was not part of the group harassing Coleman right before he got shot. And Baker, like Smith, was surprised and concerned to see Jordan retrieve a shotgun from his bedroom and wave it around the crowded living room. When Coleman was shot, it was Baker who tried to call 911, only to be stopped by Jordan pointing the gun at him. But like the witness in Bailey, Baker did assist Jordan in dumping Coleman’s body. And both Baker and Smith concealed Jordan’s involvement from the police for almost a year. This is what made them accessories after the fact, and they were charged as such. So no accomplice instruction was needed in this case either. See Slaughter, 815 So.2d at 1135 (¶ 68) (finding the trial court was within its discretion to refuse a cautionary instruction for a witness who “was not an accomplice” but rather “was indicted for accessory after the fact”); see also Smothers v. State, 756 So.2d 779, 787 (¶ 23) (Miss.Ct.App.1999) (“A cautionary instruction about accomplice testimony is not required unless there is an accomplice.”).[6]

III. Sufficiency and Weight of the Evidence

¶ 51. Finally, Jordan challenges the sufficiency and weight of the evidence. He essentially argues the only testimony the State had was the testimony of Smith and Baker, which was not enough to convict. We disagree. Viewing their testimony—as well as the rest of the evidence—in the light most favorable to the State, as we must, we find the evidence was sufficient and the jury’s verdict was not against the overwhelming weight of the evidence.
¶52. While Jordan collapses the two into one argument against the evidence, “sufficiency of the evidence” and “overwhelming weight of the evidence” are not synonymous. Instead, as our supreme *849 court clearly laid out in Bush v. State, the two phrases denote two different eviden-tiary challenges, raised through separate procedural mechanisms. Bush v. State, 895 So.2d 836, 843-45 (¶ 15-19) (Miss. 2005). So we address these issues separately.

A. Sufficiency of the Evidence

¶53. The sufficiency of the evidence is challenged through a motion for a directed verdict or a motion for a judgment notwithstanding the verdict. Leslie v. State, 171 So.3d 549, 559 (¶ 38) (Miss.Ct.App.2015). “When reviewing the sufficiency of the evidence, this court asks ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Id. (quoting Bush, 895 So.2d at 843 (¶ 16)).
¶ 54. The jury found Jordan guilty of two crimes—depraved-heart murder and felon in possession of a firearm. Section 97-3-19(l)(b) defines depraved-heart murder as:
The killing of a human being without the authority of law by any means or in any manner ... [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual[.]
Both Smith and Baker testified Jordan was waving around a shotgun inside his living room while others were in close proximity. They also both testified Baker shot Coleman. Baker further testified Jordan turned the gun on him to prevent Baker from calling for an ambulance, exhibiting an indifference to Coleman’s life.
¶ 55. Jordan insists the uncorroborated testimony of Smith and Baker was insufficient to support a guilty verdict. But our supreme court has long recognized “that persons may be found guilty on the uncorroborated testimony of a single witness.” Doby v. State, 532 So.2d 584, 591 (Miss.1988) (citations omitted). The State presented two witnesses, whose testimony corroborated each other’s, along with evidence Jordan tried to intimidate these witnesses once they started cooperating. Moreover, Baker’s testimony was corroborated by the fact Coleman’s phone stopped emitting a signal at the time Baker said it was burned. And police found a metal barrel used for fires outside Henderson’s home. Viewing their testimony in the light most favorable to the State, we find it was sufficient for a rational juror to find Jordan guilty of depraved-heart murder beyond a reasonable doubt.
¶ 56. This evidence was also sufficient for a rational juror to find Jordan guilty of felon in possession of a firearm. This crime has two elements: (1) the defendant was in possession of a firearm, and (2) the defendant had been convicted of a felony crime, Cooley v. State, 14 So.3d 63, 66 (¶ 13) (Miss.Ct.App.2008); Miss.Code Ann. § 97-37-5. Both Smith and Baker testified Jordan went to his bedroom to retrieve a shotgun, which he proceeded to wave around. And Jordan does not contest the fact he had previously been convicted of a felony.
¶ 57. Therefore, we find no error in the trial court’s denial of Jordan’s motion for a judgment notwithstanding the verdict.

B. Weight of the Evidence

¶58. The weight of the evidence is challenged through a motion for a new trial. See Dilworth v. State, 909 So.2d 731, 737 (¶ 20) (Miss.2005). This court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18). Like the *850 review of the sufficiency of the evidence, a review of the weight of the evidence views the evidence “in the light most favorable to the verdict.” Id.
¶ 59. Jordan insists we must view the testimony of the State’s two key witnesses, Smith and Baker, unfavorably, given they were charged as accessories after the fact.[7] And when their testimony is weighed against the contradictory testimony by defense witnesses and the lack of forensic evidence, Jordan claims the verdict cannot stand. But our review requires we accept all evidence consistent with the defendant’s guilt as true, “together with any reasonable inferences that may be drawn from the evidence.” Crook v. State, 105 So.3d 353, 364 (¶ 33) (Miss.Ct. App.2012) (quoting Young v. State, 891 So.2d 813, 821 (¶ 21) (Miss.2005)). Smith and Baker both testified Jordan shot Coleman. Baker further testified he and Henderson helped Jordan dump the body and burn evidence. And the jury was free to accept their testimony as more credible than Jordan’s and his girlfriend’s contradictory testimony. See Grossley v. State, 127 So.3d 1143, 1149 (¶ 21) (Miss.Ct.App. 2013) (citations omitted). After all, the jury had “a much better vantage point to view and assess the tone, mannerisms, and disposition of witnesses.” King v. State, 798 So.2d 1258, 1262 (¶ 14) (Miss.2001).
¶60. Moreover, “the absence of physical evidence does not negate a conviction where there is testimonial evidence.” Brown v. State, 130 So.3d 1074, 1082 (¶ 24) (Miss.2013) (quoting Graham v. State, 812 So.2d 1150, 1153 (¶ 9) (Miss.Ct.App.2002)). That the State had no forensic evidence was thoroughly explored at trial, along with the State’s explanation why—that Jordan had burned his clothes, sold his car, and vacated his rental home, all before the police investigation zeroed in on him. And it was up to the jury to assess how much weight the forensic evidence, or lack thereof, should be given.
¶61. “[T]he power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Bush, 895 So.2d at 844 (¶ 18) (citation omitted). This is not one of those cases. Therefore, we find no error in the trial court’s denial of Jordan’s motion for a new trial.
¶ 62. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MURDER, AND COUNT IV, FELON IN POSSESSION OF A FIREARM, AND SENTENCE IN COUNT I OF THIRTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND THIRTY YEARS TO SERVE, FOLLOWED BY FIVE YEARS’ SUPERVISED POSTRELEASE SUPERVISION AND THEN FIVE YEARS’ UNSUPERVISED POSTRELEASE SUPERVISION, AND IN COUNT IV OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, TO BE SERVED CONCURRENTLY WITH THE SENTENCE IN COUNT I, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON AND JAMES, JJ., CONCUR. FAIR, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND ISHEE, J.; WILSON, J., JOINS IN PART.

. Mattox v. State, 243 Miss. 402, 413, 137 So.2d 920, 923 (1962),

. Smith and Baker had indicated they wanted to plead guilty, so they were not set to be tried with Jordan and Henderson.

. As the dissent points out, after the State had rested and just prior to his taking the stand, Jordan did renew his motion for a mistrial. And in this oral motion, his counsel did for the first time cite Brooks v. State, 903 So.2d 691, 699-700 (¶¶ 29-35) (Miss.2005), for the proposition that, in that case, the Mississippi Supreme Court "held that it was reversible error to admit evidence of ... rap lyrics discussing murder[.]” The circuit judge responded that the video was relevant and probative because Jordan participated in the video. And the State had shown the "consensus message that’s described in the video"—killing a life-long friend for turning State's evidence—was connected to the State’s two key eyewitnesses, Smith and Baker.
"Whether to grant a motion for a mistrial is within the sound discretion of the trial court.” Caston v. State, 823 So.2d 473, 492 (¶ 54) (Miss.2002). And for the reasons stated in paragraphs 31 and 32 of this opinion, we find the trial court did not abuse its discretion here by denying Jordan's renewed. motion.

. "Murk” is slang for murder. United States v. Scruggs, 266 Fed.Appx. 258, 261 (4th Cir. 2008) (unpublished).

. See also United States v. Miller, 276 F.3d 370, 373 (7th Cir.2002) (“Evidence that the defendant threatened a potential witness or a person cooperating with a government investigation is relevant to show the defendant’s consciousness of guilt.”); Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir.1996) (holding that evidence of witness intimidation is clearly admissible to show consciousness of guilt); United States v. Mendez-Ortiz, 810 F.2d 76, 79 (6th Cir.1986) (holding that evidence of the defendant’s attempts to intimidate an adverse witness is admissible to establish "consciousness of guilt”).

. Jordan argues this is a distinction without a difference, citing Jones v. State, 381 So.2d 983, 988 (Miss.1980). In Jones, a capital case, the Mississippi Supreme Court did find, “[a]s a confessed accessory after the fact to the murder with which Jones was charged, [the State’s witness] was an accomplice.” Id. But the witness’s status as an accomplice was based on the facts in that case. While Jordan cites Jones for the broad proposition that "[a] confessed accessory after the fact is considered an accomplice within the rule that the testimony of an accomplice must be considered with caution,” not once in the past thirty-five years has Jones ever been cited for that purpose. Instead, the supreme court has maintained the distinction between accomplices and accessories after the fact, finding only accomplices require accomplice instructions. E.g., Slaughter, 815 So.2d at 1135 (¶¶ 64-68).
Moreover, in Jones, despite treating the witness’s testimony as that of an accomplice, the supreme court still found no error in the trial court's refusal of an instruction on accomplice testimony. Jones, 381 So.2d at 991. Though the supreme court noted it would not have been "improper to grant an instruction of this nature,” the court found, ultimately, "the decision to grant or refuse it rest[ed] within the sound discretion of the trial court.” Id. (internal citation omitted).

. But see Discussion, § II.B, supra.