**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2015-KA-00164-COA**

**CHARLIE C. HENDERSON A/K/A CHARLIE C.**         **APPELLANT**
**HENDERSON, JR. A/K/A CHARLES**
**HENDERSON**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/10/2014 |
| TRIAL JUDGE: | HON. ROBERT WALTER BAILEY |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE MCMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | BILBO MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF ACCESSORY AFTER THE FACT TO MURDER AND SENTENCED TO FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TWO YEARS SUSPENDED AND FIVE YEARS OF PROBATION |
| DISPOSITION: | AFFIRMED - 06/28/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND ISHEE, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. A Lauderdale County jury found Charlie Henderson guilty of accessory after the fact to the murder of Aaron Coleman. The trial judge sentenced Henderson to five years in the custody of the Mississippi Department of Corrections (MDOC), with two years suspended

and five years of supervised probation. Henderson now appeals, claiming the trial court erred in admitting into evidence a profane rap video posted on YouTube, featuring Henderson and others, who act out a violent scene at the end of the video. He argues the video was irrelevant and highly prejudicial. Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. At approximately 3 p.m. on February 27, 2011, twenty-one-year-old Coleman received a phone call to meet a friend. Coleman lived with his mother, younger sister, and maternal grandmother. He told his mother that he was leaving to meet his friend and would be back. It was Sunday, and the next morning Coleman had to go to work at West Lauderdale High School, near Meridian, Mississippi. Coleman left home in his vehicle, wearing red shorts and a white t-shirt. By 8 p.m. that evening, Coleman's family became concerned because he had not returned home. They called and texted his cellular phone, but he did not answer.

¶3. When Coleman had not returned by the following morning, his mother called the police and Coleman's best friend, Bobby Baker. Coleman's mother and Baker rode around trying to locate Coleman but could not find him. Baker told Coleman's mother that Sunday afternoon he and Coleman had ridden around; then Coleman had dropped him off at the house of a friend, William Michael Jordan, and left.

¶4. The following Thursday, law enforcement found Coleman's vehicle on Kewanee Road near Meridian. Only Coleman's fingerprints were found on the vehicle. The following Sunday, Coleman's body was found on the side of Interstate 20, near the Kewanee

Road exit. The chief medical examiner for Mississippi testified that Coleman died of a contact shotgun wound to the lower abdomen. The shotgun pellets had caused massive damage to the abdominal organs, and Coleman probably bled to death within minutes of being shot. Coleman's body showed evidence of bodily decomposition, some of which consisted of "scavenger activity." He was wearing the same clothing he had on the Sunday he disappeared.

¶5. Detective Mark Chandlee of the Meridian Police Department interviewed Coleman's friends, including Baker and Jordan, because he had information that Coleman was last seen at Jordan's house the night Coleman disappeared. Henderson was also at Jordan's house that night and was friends with these individuals. Baker's and Jordan's statements matched – Coleman had dropped Baker off at Jordan's house and left, without even entering the residence. With no further leads, Coleman's case was transferred to the Mississippi Bureau of Investigations (MBI) as a cold case.

¶6. Nearly a year after Coleman's disappearance, in January 2012, cold-case investigator Danny Knight of the MBI took over the case. Knight received a tip that led him to JaMichael Smith, who was from Meridian but at that time lived in Michigan. Smith was visiting Mississippi for a funeral in February 2011, and had been at Jordan's house the Sunday Coleman disappeared. He quickly left Meridian for Michigan on a bus that very night. Detective Chandlee had unsuccessfully tried to get Smith to return to Mississippi, but Knight succeeded, obtaining a warrant for Smith's arrest. In April 2012, Smith waived extradition and returned to Mississippi. On April 3, 2012, Smith gave a statement to Knight

3

that led to the arrest of four individuals: Smith, Baker, and Henderson were charged with accessory after the fact to murder, while Jordan was charged with depraved-heart murder, or alternatively manslaughter, and felon in possession of a firearm.

¶7. Initially, Baker had refused to give a statement to law enforcement, but on June 15, 2012, he gave a statement to Knight that was consistent with Smith's earlier statements on what transpired on Sunday, February 27, 2011. Several months later, Baker was alerted by a friend about a violent, profane rap video posted on YouTube on April 9, 2013, entitled "'F— All Y'all' by Gutta G featuring King Chris," which "starred" Henderson and another rapper; Jordan had a small part. Baker interpreted the video to threaten him personally for his statement to law enforcement about the events of February 27.[1]

¶8. In September 2014, Henderson's trial for accessory after the fact to murder began.[2] Baker testified for the prosecution. He admitted to lying to investigators initially about not knowing what happened to Coleman, but claimed the statement he gave to Knight was the truth. He had known Henderson, Jordan, Smith, and Coleman since elementary school. On the day Coleman disappeared, Baker testified he picked Coleman up and they rode around

---

[1] The rap video was published on YouTube in April 2013, after Smith and Baker had implicated Jordan and Henderson, but before Jordan's trial commenced. At Jordan's trial, both Baker and Smith testified, and both felt threatened by the video, but at Henderson's trial, only Baker testified; so Smith's reaction will not be discussed.

[2] Initially, Henderson and Jordan were to be tried together, but on the morning of trial on February 3, 2014, after the jury was selected, Henderson was granted a severance. *See Jordan v. State*, 2014-KA-00615-COA, 2015 WL 8142708 (Miss. Ct. App. Dec. 8, 2015) (This Court affirmed Jordan's conviction for depraved-heart murder and felon in possession of a firearm.). Baker and Smith pleaded guilty; so they were not tried with Jordan and Henderson.

Meridian. Eventually, they went to Jordan's house, where ten to twelve individuals were drinking beer, smoking marijuana, and visiting. Everyone appeared to be having a good time. As people began leaving the party, Coleman received a call from his mother to come home. As Coleman got up to leave, Henderson began teasing and tussling with him in a friendly way, because Coleman had a curfew. Around this time, Jordan, who was drunk, went in his bedroom, grabbed a shotgun, and returned to the living room. He began swinging the gun around recklessly, pointing it at people. The gun went off; Coleman was shot in the stomach, and Henderson was nearly hit. Very little blood was shed from Coleman's wound.

¶9. Immediately after Coleman was shot, Smith ran out the back door and took the first bus back to Michigan. Baker wanted to call an ambulance because Coleman was still alive, but Jordan pointed a shotgun at Baker, and Henderson told Baker to hang up his phone, even though Jordan maintained the shooting was an accident. Instead, Henderson, Jordan, and Baker loaded Coleman in Jordan's vehicle. Baker got in the backseat with Coleman. As Jordan and Henderson were deciding what to do, Coleman quit breathing. When Henderson realized Coleman was dead, he went through Coleman's pockets and found his car keys. Jordan started his vehicle, with Baker in the passenger seat and Coleman's body in the back seat. Henderson followed, driving Coleman's vehicle.

¶10. They drove around Meridian and made their way onto Interstate 20, when Jordan's vehicle ran out of fuel; so, they pulled over on the side of the interstate near the Kewanee exit and called Henderson to bring them some gasoline. When Henderson arrived, he was

5

angry because Coleman's body was still in Jordan's vehicle. Henderson suggested they dump Coleman's body on the side of the interstate and leave Coleman's vehicle at another location. Coleman's body was unloaded and slid down the embankment. Henderson drove Coleman's vehicle to Kewanee Road where Henderson wiped down the vehicle to erase fingerprints and threw the keys on the floorboard. They left Coleman's vehicle and traveled in Jordan's vehicle to Henderson's house. The next-door neighbor had a large "fire barrel" in which they burned their shirts, and Coleman's cell phone, before returning to their respective homes. The next day, Baker rode around Meridian with Coleman's mother in search of Coleman, knowing he was dead. One week later, Henderson, Baker, and Jordan met to get their story straight – that Coleman dropped Baker off at Jordan's house and they never saw Coleman again. Smith, however, who remained in Michigan, was never contacted about the agreed-upon story.

¶11. Baker claimed he quit telling the agreed-upon story because he began to fear Henderson and Jordan.[3] After giving his June 12, 2012 statement to Knight, Baker became aware of the rap video, featuring Henderson and another rapper, with Henderson's brother, Jordan, and others having smaller parts. The video had been uploaded to YouTube in April 2013, after indictments were issued for Jordan, Henderson, Baker, and Smith. Baker informed his attorney of the video, and his attorney informed Knight. The music video depicts a situation where someone has been falsely implicated of a crime by a long-time friend; however, the informant thinks his friends are ignorant of his betrayal. The rap video

---

[3] Baker testified that he moved back to Ohio in late 2012 because he feared for his life after giving a statement to investigators.

6

was violent, and Baker felt threatened by it. At the end of the video, there is a short segment where Henderson and other men chase a young man into the woods – where he is surrounded – then Henderson shoots the young man. Over the defense's objection, the video was allowed into evidence at Henderson's trial and played for the jury.

**ANALYSIS**

¶12. Henderson argues that the trial court erred in admitting the YouTube rap video into evidence because it was irrelevant, confusing, and prejudicial.

¶13. The trial judge has a great deal of discretion regarding the relevancy and admissibility of evidence. Therefore, this Court will not reverse a trial judge's evidentiary ruling unless the judge abuses this discretion so as to prejudice the accused. *Gore v. State*, 37 So. 3d 1178, 1183 (¶13) (Miss. 2010) (citations omitted). "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Dickerson v. State*, 175 So. 3d 8, 20 (¶40) (Miss. 2015) (quoting M.R.E. 401). However, relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* (quoting M.R.E. 403).

¶14. Generally, "all evidence introduced in a criminal prosecution must be relevant to the guilt or innocence of the accused, but that rule is not violated by the admission of evidence that [the] accused attempted to suppress evidence against himself." *Mattox v. State*, 243 Miss. 402, 413, 137 So. 2d 920, 923 (1962). In *Mattox*, the Mississippi Supreme Court held if there is evidence a defendant attempted to keep a witness from testifying, this evidence

7

has "probative value as an incriminating circumstance inconsistent with [the defendant's] innocence and as tending to show a consciousness of guilt and that his cause lacked honesty and truth." *Id.* (citations omitted).[4]

¶15. The defense argument that the video was irrelevant is without merit. The video was posted on YouTube on April 9, 2013 – nearly a year after Smith and Baker had given statements incriminating Jordan and Henderson, and the four individuals had been indicted – but nearly a year before Henderson's and Jordan's trials. So the video was posted after Smith and Baker gave incriminating statements, but before either one testified at Jordan's or Henderson's trials. The six-minute-long video begins as a rap-music video with Henderson lip-syncing, and ends with a short scene where a young man is shot. The main rapper is Henderson, but Jordan also appears briefly, in addition to Henderson's brother and other extras.[5]

---

[4] *See also United States v. Begay*, 673 F.3d 1038, 1046 (9th Cir. 2011) (Evidence showing that a defendant seeks to intimidate the witnesses against him is admissible to show the defendant's "consciousness of guilt."); *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) (holding evidence of witness intimidation is clearly admissible to show "consciousness of guilt"); *United States v. Monahan*, 633 F.2d 984, 984 (1st Cir. 1980) ("[T]hreatening personal harm to a witness . . . implies a knowledge and fear of particular and damaging testimony intimately related to the prosecution at hand" and is "relevant to show consciousness of guilt."); *State v. Wilson*, 171 So. 3d 356, 365 (La. Ct. App. 2015) (finding evidence for the State of attempts by the defendant to intimidate witnesses has substantial probative value).

[5] This Court's *Jordan* opinion describes the video in detail. In that case, Jordan objected to the admission of the video because it was unauthenticated and irrelevant. We agreed with the trial court that the video was authentic, as well as admissible, because it was probative – it was aimed at intimidating Smith and Baker into not testifying. *Jordan*, 2015 WL 8142708, at *4-9.

While that case included a dissenting opinion finding, in part, the music video

8

[T]he video begins . . . [with] a close-up shot of Jordan's face. The scene then turns to his codefendant, Henderson, who begins rapping, "used to be my homeboy – used to be. Asked him why he flipped on me." The rap proceeds to question how a life-long friend could turn State's evidence. Henderson repeatedly warned that when "it's your turn, you gonna burn."[6] While Jordan does not rap in the video, he can be seen singing along with the chorus, waving his middle finger and making other hand motions that go along with the words.

*Jordan*, 2015 WL 8142708, at \*4 (¶23). Henderson raps repeatedly about shaking the informant's hand, but the informant "can't even look me in the eyes; he had to look the other way, f— all y'all. . . . A lot of enemies but they don't show themselves – witness protection." No one's name is ever explicitly mentioned; Henderson "ain't goin' to say nobody's name, just know all of 'em's to blame. . . . You're my best friend from elementary." Other threatening, probative lyrics are in the second and third verses:

You a jerk. *Your kind the kind to get "murk"*[7] *for saying foolish shit. . . . "Ain't goin' say you took the stand, you cracked before you made it . . .* there, turned on your own homies. . . . He's been a bitch since he was five. Y'all won't make it in these woods, y'all goin' to eat your words alive.

(Emphasis added). The scene after the music video is even more probative.

The rap song is followed by a scene featuring Henderson but not Jordan. In this segment, an unidentified man walks up to Henderson and his circle of friends. The group chases the man into the woods. Henderson then tells the man, "You already know," and repeatedly asks him, "How you kill a snake?" Henderson then pulls a handgun on the man. The video ends with Henderson

---

prejudicial to Jordan because he had only a minor role in the video, this case is distinguishable in that Henderson is the lead performer in the video.

[6] Other repeated lyrics state: "Why you turn on me, homey? Witness protection. You goin' to learn, homey, when it's your turn, homey. You gonna burn, homey. I've known you since elementary."

[7] "Murk" means to beat someone to death. *Jordan*, 2015 WL 8142708, at \*6 n.4.

> pointing the gun directly at the camera. The screen goes blank and a gunshot rings out.

*Jordan*, 2015 WL 8142708, at *4 (¶24). Under *Mattox*, evidence is admissible it if shows a consciousness of guilt. The video is relevant to show Henderson's attempt to prevent Baker from testifying at trial, through intimidation, about Henderson's involvement in the murder.

¶16. Henderson further argues that even if the video was relevant, the probative value is substantially outweighed by the danger of prejudice to Henderson, because the video is not flattering to him – the language is offensive and the subject matter is violent. Citing Rule 403, the trial court ruled that the probative value of the video was not "substantially outweighed by the danger of unfair prejudice." The trial judge determined:

> [I]f Mr. Baker did not testify, the State's case would be almost unwinnable, [b]ut with Mr. Baker's testimony, that adds a different side to this case, because there's eyewitness testimony from one charged with accessory after the fact to murder who's testifying against Mr. Henderson. So, it's very important that the jury hears his testimony.

We disagree with the trial court in that the issue is not the probative value of Baker's testimony, upon which the trial court based its ruling, but the probative value of the video.

¶17. The video evidence can reasonably be interpreted as a not-so-subtle threat by Henderson, the lead performer in the video, meant to intimidate Baker, a long-time friend since elementary school, who turned State's evidence. Baker testified at trial that he knew his life would be threatened by Jordan and Henderson if he went to law enforcement, because he had known these individuals since childhood. Therefore, he returned to Ohio once he gave his statement to Knight in June 2012. He stated he "fear[ed] for his life."

10

Baker testified he found out about the video, which was published on YouTube in April 2013, from a friend. He knew four of the actors in the video: Henderson, Henderson's brother, Jordan, and Chris Randall. Baker felt so threatened after seeing the video he contacted his attorney about it. He felt he was the informant character because of the lyrics stating they had been friends since elementary school, he had ratted on them and could not look them in the eyes, yet there was no "witness protection." At the end of the video, Henderson made a comment to the character Baker thought was himself: "[I]f I could find a way to get him down here." Baker testified he was living in Ohio at the time, and they all knew it. Then Henderson asks "how do you kill a snake" and shoots the alleged snitch. The scene ends with the caption "to be continued." The video has substantial probative value to Henderson's consciousness of guilt under *Mattox*. Had the video shown a crime more similar to Coleman's death, it might have been more prejudicial than probative, or confusing to the jury, but this is not the case. Coleman was not chased into the woods and shot, but killed by Jordan, drunkenly waiving a shotgun around.

¶18.   We do not find that the probative value of the video was substantially outweighed by the danger of unfair prejudice under Rule 403. The trial court did not abuse its discretion in admitting the video into evidence. Accordingly, Henderson's conviction and sentence are affirmed.

¶19.   **THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT OF CONVICTION OF ACCESSORY AFTER THE FACT TO MURDER AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH TWO YEARS SUSPENDED AND FIVE YEARS OF PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, WILSON AND GREENLEE, JJ., CONCUR. FAIR, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**