EN BANC ORDER
Four of the justices of this Court are of the opinion that the judgment of the Court of Appeals should be affirmed, and four are of the opinion that it should be reversed; consequently, that judgment must be, and is, affirmed.
Accordingly, as the judgment of the Court of Appeals has not been decided to be erroneous by a majority of the justices sitting in this case, the judgment of the Court of Appeals is affirmed without opinion. The costs on appeal are assessed to Lauderdale County.
SO ORDERED.
/s/ William L. Waller, Jr, WILLIAM L. WALLER, JR., CHIEF JUSTICE
TO AFFIRM: WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR AND BEAM, JJ.
KING, J, OBJECTS TO THE ORDER WITH SEPARATE WRITTEN STATEMENT JOINED BY DICKINSON, P.J., KITCHENS AND COLEMAN, JJ.
NOT PARTICIPATING: MAXWELL, J.
KING, JUSTICE, OBJECTING TO THE ORDER WITH SEPARATE WRITTEN STATEMENT:
¶ 1. William Michael Jordan was convicted of murder and felon in possession in a case devoid of physical evidence. At trial, an inflammatory rap video with a tenuous connection to this case, and which included only very minor participation by Jordan, was introduced into evidence. Its authentication was based on testimony much of which was untrue. It was error to allow the rap video into evidence. Because I believe that the decisions of the trial court and Court of Appeals are incorrect and violate Jordan’s rights, I respectfully object to the order affirming his conviction.
FACTS AND PROCEDURAL HISTORY[1]
¶ 2. Late in February 2012, Aaron Coleman’s mother reported him missing. Coleman’s car was soon found outside of Meridian .... [Sjeveral more days passed *818 before Coleman’s body was discovered in the woods near Interstate 20.
Coleman was last seen alive on February 27[, 2012,] at Jordan’s house. When questioned, Jordan confirmed [that] Coleman had stopped by that day .... Jordan told the Meridian Police that Coleman had only stayed a few minutes. After that, Jordan [asserted that he] never saw him again. Charlie Henderson and Bobby Baker—longtime friends of both Coleman and Jordan—had also been at Jordan’s house that evening. And they gave similar stories to the police.
The police [received an anonymous tip that] they should also question JaMicha-el Smith[ ] because he had been at Jordan’s house that nighty too. But Smith [had] quickly left Meridian late [the] night [of February 27, 2013,] on a Greyhound bus headed for Michigan. A year later, Smith was extradited from Michigan to Mississippi, where he finally told the police his version of what happened.

A. Smith’s Account

While Smith had grown up in Meridian, he moved to Michigan when he was seventeen .... [He did not return to Mississippi for five years.] But he returned to Meridian in February 2012 for his grandfather’s funeral. He ended up at Jordan’s house on February 27, drinking and smoking marijuana. According to Smith, everyone seemed to be having a good time when Jordan went to his bedroom and retrieved a shotgun. Jordan returned to the living room, where both Henderson and Coleman were. Jordan ... [flashed and cocked the gun.] Smith got nervous, so he went into the kitchen. Smith heard the gun go off. He saw Coleman [grab his stomach and lean] over in the corner of the living room. Smith ran out [of] the back door of Jordan’s house and took the first bus out of town.

B. Baker’s Account

Once Smith was in custody in Mississippi, Baker came forwardU too. He admitted [that] he had initially lied to investigators when he denied knowing what happened to Coleman. The truth, according to Baker, was that he[,] too[,] was in Jordan’s living room, drinking and smoking marijuana, when Jordan shot Coleman.
Coleman claimed he had received a phone call from his mother, saying it was time to come home. Henderson started teasing Coleman about having a curfew. This is when Jordan retrieved the shotgun. Like Smith, Baker was worried about the gun, so he kept his eyes on Jordan. He saw the gun go off, Henderson lunge, and Coleman—who was standing right behind Henderson— get shot in the stomach.
Coleman fell over, but he was still breathing. Baker wanted to call for an ambulance[,] [b]ut Jordan pointed the gun at him and told him to stop. Baker tried to reason with Jordan, saying everyone would see it was an accident and that Jordan did not know the gun was loaded. So with Coleman still alive, Baker started to call 911.... Henderson told him to hang up. Baker saw Smith run out the back door.
About ten minutes went by. Coleman was still alive, and Jordan and Henderson were trying to figure out what to do. They finally told Baker to help them load Coleman into the back of Jordan’s Honda. Baker got into the backseat with Coleman. Jordan and Henderson stayed outside the car, further devising a plan. Another five minutes passed .... Coleman suddenly stopped breathing and his whole body *819 stopped moving. Henderson opened the door and saw that Coleman had died.
At this point, Jordan’s live-in girlfriend pulled up in her car. Henderson quickly shut the car door to conceal Coleman’s body. Jordan followed his girlfriend into his house for a few minutes, while Henderson rifled through Coleman’s pockets and found his keys. Baker testified that Henderson then pulled out a pair of gloves. When Jordan exited his house again, Jordan got into the driver’s seat of his car. Henderson, gloves on, then took Coleman’s keys and got into Coleman’s car. The two cars started' driving around Meridian .... Jordan and Henderson were on their cell phones [the entire time] trying to figure out what to do. Jordan eventually turned onto I-20[,j but ran out of gas. He [pulled] over to the shoulder and waited for Henderson to bring him more fuel.
When Henderson pulled up behind them with a gas can fifteen minutes later, he was surprised [that] Coleman’s body was still in the backseat. Baker and Jordan then lifted the body out of the car and rolled it down an embankment, where it was found days later. The two cars then drove off down the interstate. They took a nearby exit, where they dumped Coleman’s car.
The three then drove to Henderson’s house in Jordan’s car. There, a fourth man came out with a metal barrel and started a fire. Baker testified [that] he, Jordan, and Henderson threw their clothes into the fire, along with Coleman’s cell phone and wallet.

C. Indictment

Jordan was indicted for second-degree murder. See Miss. Code Ann. § 97-8-19(1)(b) (Rev. 2014). He was also charged with felon in possession of a firearm. See Miss. Code Ann. § 97-37-5 (Rev. 2014).
Henderson and Baker were indicted as accessories after the fact to the murder, for their role in dumping Coleman’s body. Smith[,] too[,] was indicted as an accessory after the fact[] because he knew Jordan had killed Coleman[,] but did not come forward until almost a year later ....
Jordan and Henderson were set to be tried together.[] But the morning of trial, after the jury was selected, Henderson moved for severance :... Jordan had subpoenaed Henderson as a defense witness, and to avoid issues with Henderson asserting his Fifth Amendment right against self-incrimination in response to certain questions by Jordan in the joint trial, the judge granted Henderson’s motion ....
During Jordan’s trial, Smith and Baker testified for the State, but Jordan ultimately decided not to call Henderson to testify. Jordan, however, took the stand and testified in his own defense. Jordan stuck to his original story—that while, he, Coleman, Henderson, and Baker had all been at his house on February 27, Coleman'left after a few minutes. Jordan’s girlfriend also testified. She said [that] he had come home at 3 p.m. that day. While Henderson and Baker were there with Jordan, she insisted [that] Coleman had never come by that day[,] [n]or did Jordan ever leave with Henderson and Baker.
[The State did not offer any] physical evidence ....
Jordan v. State, 212 So.3d 836, 836-41, 2015 WL 8142708, at **1-3, No. 2014-KA-00615-COA(Miss. Ct. App. Dec. 8, 2015).
¶ 3. At trial, the State also introduced a YouTube video of a rap song. The defense objected to its introduction and suggested the evidence be proffered outside the pres *820 ence of the jury, but the judge stated “I can rule,” thus having the video authenticated in the presence of the jury. The defense objected that the video was not authenticated, was not relevant to Jordan’s guilt or innocence, and that it was not probative under the Rules of Evidence. The State decided to establish the foundation for the video with the testimony of Danny Knight, an investigator on the case. Knight testified that Baker’s attorney alerted him to the existence of a video on YouTube. Knight stated that the video is of a “mock killing,” and that it was “a reenactment, in my opinion, of the killing of Aaron Coleman.” He testified that the “stars” of the video were William Jordan and Charlie Henderson. He then stated that the video is “a rap video that Mr. Jordan and Mr. Henderson get a witness, which is Mr. Baker, and they get him out in the woods and kill him for ratting on them.” Knight also testified that the video was a threat to Baker. The court then admitted the short, five-and-a-half minute video into evidence without even watching the video. ‘The video was not then published to the jury, but went with them to the jury room for deliberations, and was referred to by the prosecution multiple times during the trial.
¶ 4. The video is five minutes and thirty-five seconds long. It
features performances by Henderson and “King Chris.” A third man is credited as the director. There are five or six extras who are uncredited—Jordan was one of them. Baker and Smith testified that they “recognized” Henderson, Jordan, and “King Chris,” though their testimony differed as to whether his name was Chris King or Chris Randall. Smith and Baker did not seem to know any of the extras (other than Jordan).
The video was shot with a high-definition camera, which at times tracks and pans. It includes numerous “artsy” shots—the camera tracks across a chain link fence, Henderson appears silhouetted in a doorway, a man (who is probably Jordan) smokes in the dark, Henderson shakes his head sadly in slow motion, etc. The music and vocals were recorded separately from the video, presumably in a studio, and are dubbed over. The video seems to have been assembled from ten or so scenes that were filmed separately and spliced together, back and forth throughout, as well as a number of isolated shots. Henderson is seen wearing three different sets of clothes, suggesting that the filming was done over a period of time. The lip-synching is coordinated with the vocals and music, apparently requiring that the performances at each filming location be scripted out in advance .... [T]he production values and the number of people involved ... suggest that the video was not created just as a pretext to threaten Smith and Baker.
Jordan is just one of the uncredited extras. He appears on screen for a total of about thirty seconds [out of five minutes and thirty-five seconds], in only one of the major settings, sitting at a table to Henderson’s right. Another extra stands to Jordan’s right, doing the same things Jordan does. And most of the time Jordan is at the periphery as the camera focuses on one of the rappers; often only Jordan’s arm is visible. When Jordan can be seen, he sits and drinks or smokes, or he mouths the words to the chorus and mimes along. He is apparently seen in one of the “establishing” shots at the beginning, sitting on a couch in a dark room smoking what appears to be a marijuana cigarette.[] Some of the other extras have speaking parts in the “short film” at the end, but Jordan does not appear there .... [It *821 appears that] Jordan is never actually-heard on the video.
... [T]he lyrics of the song ... [are] threatening—they are also very profane and offensive. The basic outline fits—the narrators have been betrayed by a friend who turned state’s evidence. But otherwise the story differs in important respects.
The first half or so of the song is preformed by Henderson, and King sings the remainder. Both sing in the first person and both relate the same basic events as happening to them[]— that they were falsely implicated by a friend-turned-pohce-informant, that the friend thinks they are ignorant of his betrayal, that he shook their hand but would not look them in the eyes, that they have been praying “a hundred times a day.” Toward the end of the song, King says he has been praying because he wants to murder the informant.
Not only does the song not contain explicit threats against Smith or Baker, but it is Uttered with references to incidents and people that appear to have nothing to do with this case. The encounter where the informant shook the narrators’ hands but would not look them in the eye is referred to over and over in the song (both Henderson and King sing about it, and it forms most of the chorus), but no one testified it had actually happened in real life. Henderson refers to some kind of event involving an unnamed woman, and the informant’s sister making “statements” (presumably to the pohce; he makes a gesture like he is writing). He also makes the puzzling complaint that the informant refuses to “speak up on my parents just because I won’t speak up on yours.” Henderson describes a more intimate relationship with the informant than was attested in this case: they were “best friends from elementary” school, and Henderson used to give the informant money and food. He suggests that the informant needed charity because he was a poor drug dealer (he had no “hustle skills”). Henderson believes he was betrayed because of “jealousy and envy,” which the informant had concealed; King says the informant did it “just to save himself.” Henderson refers to the informant’s story as “bulls***” and King says he wants to kill the informant without “even asking him why he lied.”
Jordan v. State, 212 So.3d 836, 853, 2015 WL 8142708, at **14-25, No. 2014-KA-00615-COA (Miss. Ct. App. Dec. 8, 2015)(Fair, J., dissenting).
¶ 5. At the very beginning of the State’s attempt to authenticate the video using Knight’s testimony, the defense objected to Knight’s testimony. The court overruled the objection, and the defense asked to reserve the right to make a motion, and the court granted this request. Throughout Knight’s testimony to authenticate the video, the defense objected, and even stated “Let the record reflect I have a continuing objection.” As Knight’s testimony continued, the defense continued to explain his objections, but was met with the prosecutor complaining that he had “about had it with the speaking objections.” At the conclusion of Knight’s testimony, Jordan’s counsel asked for permission to make the motion he had reserved the right to make. He moved for a mistrial, in part because the video was not properly authenticated, was not relevant, and violated the discovery rule. Then again, prior to Jordan testifying in his own defense, his counsel renewed his motion for mistrial due to the admission of the YouTube video and renewed his objection to its admission, and cited Brooks v. State, in which rap lyrics were objected to under Rule 404(b), thus *822 triggering the balancing test of Rule 403. In denying the motion, the trial court, which had apparently still not actually watched the video, held that Jordan “was a star player in the video. There is testimony and evidence that relates the consensus message that’s described in the video to the two witnesses that were testifying against Mr. Jordan. That’s relevant. That’s probative.”
¶ 6. The jury ultimately found Jordan guilty of both murder and felon in possession of a firearm. Jordan filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, new trial, in which he argued that the trial court “erred by the admission of the youTube [sic] video over continuous objections of Defendant without having viewed it, based on hearsay, relevance and Rule 403, without weighing the balancing test as to prejudicial effect versus probative value.” He also argued that the court “erred by allowing the prosecution to present opinions of investigator Knight ... as to the youTube [sic] video” and “by allowing the prosecution to place into evidence the youTube [sic] video without proper authentication, with only verification by the investigator based on hearsay. The prejudicial effect outweighed any probative value.” The trial court denied Jordan’s motion, and he appealed.
¶7. A divided Court of Appeals affirmed. The majority found that the video was relevant and had been properly authenticated. It also argued that Jordan only raised two reasons why the video should not be admitted at trial, and thus found that Jordan’s argument that the video should not have been admitted under Mississippi Rules of Evidence 404(b) and 403 procedurally barred. It also found that the trial court did not commit plain error under Rule 403 in admitting the video.[2] Judge Fair dissented. He argued that Jordan had clearly preserved the issue of admission of the video under Rules 404(b) and 403, given that he raised the issue at trial and the trial judge actually ruled on it. He also argued that the video was improperly introduced into evidence, and that, combined with the multiple statements about it after it was admitted into evidence, it was cumulative error that was overwhelming.
ANALYSIS
¶ 8. This Court reviews the admission of evidence for abuse of discretion. Debrow v. State, 972 So.2d 550, 552 (Miss. 2007). “A case may be reversed based on the admission of evidence if the admission results ⅛ prejudice and harm’ or adversely affects a substantial right of a party.” Smith v. State, 839 So.2d 489, 495 (Miss. 2003).

1. Issue Preserved for Appeal

¶ 9. As everyone acknowledges, Jordan preserved for appeal the issues of the relevance of the video and its authentication, or lack thereof. Where the parties and the Court of Appeals opinions disagree is whether Jordan preserved for appeal the issue of whether the video was improperly admitted under Rules 404(b) and 403.
¶ 10. A contemporaneous[3] objection is generally required to preserve an issue for appeal. This is because this Court will not pass on anything that the trial court has not had an opportunity to rule on itself, *823 except plain error. Indeed, the primary purposes of the contemporaneous objection rule are “to permit the trial court to accurately evaluate the legal issues and to enable the appellate court to apprehend the basis of the objection.” Goff v. State, 14 So.3d 625, 640 (Miss. 2009) (quoting Kettle v. State, 641 So.2d 746, 748 (Miss. 1994) (quoting Uptain v. Huntington Lab, Inc., 723 P. 2d 1322, 1330-31 (Colo. 1986))). So an objection that serves those purposes, even if not raised at the exact moment the evidence is introduced, may be sufficient under the facts of a particular case. See Goff, 14 So.3d at 640. Not only did the defense in its original objection object that the video was “not probative,” it also objected later during the trial to the video’s admission specifically based upon Rules 404(b) and Rule 403. Then, the defense filed its motion for new trial and specifically raised the Rules 404(b) and Rule 403 issues. The trial court actually ruled not once, but twice, specifically on these issues, including explicitly ruling on the later trial objection, finding that the video was probative. Clearly, the purposes of requiring contemporaneous objections have been met. The trial court did have at least two opportunities to evaluate the legal issues, and did so evaluate. And this Court can clearly apprehend the basis of the objection.
¶ 11. Moreover, Rule 403 “is the ultimate filter through which all otherwise admissible evidence must pass.” McKee v. State, 791 So.2d 804, 810 (Miss. 2001) (quoting Bounds v. State, 688 So.2d 1362, 1370 (Miss. 1997) (overruled on other grounds by Brown v. State, 890 So.2d 901 (Miss. 2004))) (emphasis added). Additionally, “Rule 404(b) is an issue of relevancy[.]” Carter v. State, 722 So.2d 1258, 1261 (Miss. 1998). In Carter, the defense objected to the admission of evidence of prior criminal conduct on the grounds of relevance, but not specifically on the grounds of Rule 404(b). Id. This Court found that the issue was not procedurally barred since Rule 404(b) is an issue of relevance and the defense had objected on the grounds of relevance. Id. “Where the specific grounds for objection are apparent from the context, a general objection is sufficient to preserve the error for appeal.” Id. at 1261-62. In this case, Jordan objected multiple times regarding relevance, and Rule 404(b) is an issue of relevance. Further, all otherwise admissible evidence must go through the filter of Rule 403. Thus, Jordan’s multiple objections, and the trial court’s rulings on those objections, were certainly sufficient to preserve the issue for appeal.

2. Failure to View Video

¶ 12. The Court of Appeals failed to address the trial court’s failure to actually view the short video it allowed into evidence. It is impossible for a trial court to rule on the admissibility of evidence it does not even view. This is especially true when, as here, the testimony authenticating the video was largely incorrect, and the trial court repeated the incorrect information in determining that the video was probative, namely by incorrectly stating that Jordan was a “star” of the video.[4] See, e.g., Tard v. *824 State, 132 So.3d 550, 553 (Miss. 2014) (trial court failed to watch entire videotaped interrogation, thus this Court was unable to determine if the trial court erred). The trial court cannot adequately rule on that of which it knows nothing. What if, for example, a trial court ruled on the admissibility of gruesome photographs without actually viewing the photographs? The trial court’s ruling on the admissibility of the video without having watched the video is highly problematic. This is especially true given that the trial court’s ultimate ruling on the issue was explicitly based upon incorrect information regarding the video.

3. Authentication

¶ 13. The State claims that the evidence in question was a YouTube video in which Henderson and Jordan “rapped lyrics” to threaten Baker and Smith, the State’s witnesses. Mississippi Rule of Evidence 901 provides that authentication or identification is a condition precedent to admissibility. M.R.E. 901(a). The condition precedent “is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.” Id. In a case interpreting Federal Rule of Evidence 901(a), the Fourth Circuit noted with approval that the district court had “required the government, pursuant to rule 901, to prove that the Facebook page [that contained links to YouTube videos] were linked to” the defendants. United States v. Hassan, 742 F.3d 104, 132-33 (4th Cir. 2014). The government had introduced certificates from Facebook and Google (the owner of YouTube) under Rule 902(11) to authenticate the Facebook pages and YouTube videos. Id. at 133. The court deemed it sufficient that the government had connected the pages to the defendants as required under Rule 901, because the government showed that the Facebook pages contained the defendants’ user profiles, personal biographical information, quotations, and listing of interests, and had used IP addresses to track the Facebook pages and accounts to the defendants’ known mailing and email addresses. Id. at 133.
¶ 14. The State attempted to provide evidence that this was a rap video in which Jordan threatened Baker and Smith. Knight’s testimony failed to do so. He incorrectly testified that the video was a re-enactment of the murder of Coleman. Such an interpretation of the rap video is not remotely plausible. He then contradicted his earlier assertion and testified that the rap video essentially acted out murdering Baker. Nothing in the rap video itself indicates that this was the murder of Baker specifically. Knight also incorrectly testified that Jordan “starred” in the video. Viewing the five-and-a-half minute video easily makes abundantly clear that Jordan was a minor participant in the video. Moreover, no testimony indicated that Knight was involved in the writing of the song or lyrics or in the production of the video. How he could have any knowledge of the subjective and completely unspecified “target” of the song, if there was any target at all, is befuddling. Also important is that Knight gave no indication as to the author of the rap—so the authenticating witness was unable to even testify as to who wrote the lyrics at issue. And the rap video itself gave no indication that Jordan wrote the lyrics; in fact, the video seems to indicate that Jordan did not write the lyrics, thus it is tenuous to attribute them to him.[5] Furthermore, Knight provided no *825 testimony regarding who posted the video to YouTube. If a music producer who thought Henderson and King had talent posted it to gauge interest in them, could its posting credibly be considered a threat to Baker and Smith? Knight gave no testimony giving any indication of who posted the "video. Nor did he give any indication when the video was actually made or when the rap was written. While the rap had a post date in April 2013, YouTube users may post and re-post things, and they may copy things and post them with no connection to the creator;[6] thus, the mere posting of a YouTube video, absent more, gives utterly no indication of the date of production or creation of the rap itself, the identity of the person who posted it online, and very little indication of when the rap was originally posted to YouTube. The rap easily could have been written and/or the video produced before Coleman’s death, rendering it difficult to prove that it was a threat to Baker and Smith.
¶ 15. Overall, the evidence the State offered to show that the evidence was a rap video of Jordan threatening Baker and Smith was not sufficient to prove this. Most of the evidence offered via Knight’s testimony was completely and blatantly incorrect and had no basis in any personal knowledge of Knight’s. This is compounded by the fact that the trial court did not watch the short video, which would have easily illuminated the problems with the incorrect authenticating testimony. Moreover, no date was adduced as to when the rap was written, when the rap video was produced, or even who posted the rap video to YouTube. Since the rap video itself is not self-authenticating—it is not obviously a threat to Baker and Smith—these things are pertinent to authentication and the question of whether the rap video is a threat.
¶ 16. Because the video was not properly authenticated, the trial court abused its discretion by admitting the video.

4. Rule 403

¶ 17. The analysis need not end with authentication, because, even if it had been properly authenticated, the video is not admissible against Jordan. Rule 403 states that “[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice ....” M.R.E. 403.[7] This Court has held, in a pre-Rules of Evidence case, that “attempts by the accused to procure the death of one of the material witnesses against him” “was of probative value as an incriminating circumstance inconsistent with ... innocence; and as tending to show a consciousness of guilt and that his cause lacked honesty and truth.” Mattox v. State, 243 Miss. 402, 137 So.2d 920, 923 (1962). In Maddox, the evidence showed not merely that the defendant issued some ambiguous or arguable threat, but that he specifically asked cer *826 tain jailmates to murder the witness, and after they were released from jail, he even sent them a Christmas card with the witness’s photograph and gave them the witness’s address. Id. at 922-23.
¶ 18. In this case, whether the probative value of Jordan being an extra during approximately nine percent of a rap video for a rap that he did not write and that can only be very tenuously tied to threats to the witnesses in the case at hand, if at all, is much less probative than actual attempts to procure the death of a witness. The connection of the song to Baker and Smith is specious at best. Indeed, the only seeming connection is that the song is about a friend from elementary school, as Baker and Henderson were, and that the friend had turned state’s witness, as Baker apparently had. However, many of the other lyrics in the rap song contradict Baker and/or Smith being its subjects. The song makes several mentions of an encounter between the informant and the narrators in which the informant shook the narrators’ hands, but would not look them in the eye. No one testified that this encounter had happened involving Baker and/or Smith. The song also references the informants’ sister making statements, which never occurred in this case. The lyrics refer to the fact that the informant refuses to “speak up on my parents just because I won’t speak up on yours,” which no one testified occurred in this case. The lyrics indicated that the narrators were best friends with the informants from elementary school, and that one used to give the informant money and food, a more intimate relationship than was alleged in this case between Henderson, Jordan, Baker, and/or Smith, and a much more intimate relationship than existed between King and Baker and/or King and Smith. Neither Baker nor Smith indicated that he had ever taken charity from Henderson. Moreover, Henderson rapped lyrics stating that the informant needed charity because he was an unsuccessful drug dealer and that he was betrayed because of “jealousy and envy.” King rapped that the informant gave information “just to save himself.” The physical description of the informant in the rap included “duck lips” and “rotten teeth.” No evidence was adduced in those case that any of these lyrics remotely described the parties involved in the case.
¶ 19. Violence and retribution are spectacularly common themes in rap music. In a survey of rap songs from albums with over 1,000,000 sales (not limited to so-called gangster rap), one scholar found themes of violence in 65% of the songs, and violent retaliation in 35%. Charis E. Kubrin, Gangstas, Thugs, and Hustlas: Identity and the Code of the Street in Rap Music, 52 Social Problems 360, 369 (2005). After reviewing more than 400 popular songs, she observed: “In cases of snitching or disrespect, violent retaliation is portrayed as punishment and is characterized as an acceptable and appropriate response as part of the street code. In many instances violent retaliation is claimed to be not only appropriate but also obligatory.” Id. at 374. For snitching in particular, “rappers are not at all reluctant to administer capital punishment.” Id “Entire songs may be devoted to warning others about the repercussions of snitching and testifying.” Id. Other scholars have observed that “[ajrguably, the anti-snitching message has emerged as a central theme within hip-hop.” Rachael A. Woldoff & Karen G. Weiss, Stop Snitchin’: Exploring Definitions of The Snitch and Implications for Urban Black Communities, 17 Journal of Criminal Justice & Popular Culture 184, 190 (2010).
... [R]ap music is especially vulnerable to prosecutorial misuse because jurors often hold it in disregard or are unfamiliar with the genre’s conventions. *827 See, e.g., Andrea L. Dennis, Poetic (Injustice? Rap Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J. L. & Arts 1 (2007).
Introducing evidence of threats requires real proof of threats—because threats against a witness are supposed to be proof of the defendant’s consciousness of his own guilt. Evidence of consciousness of guilt amounts to evidence of guilt itself. McClendon v. State, 387 So.2d 112, 115 (Miss. 1980). Courts should not and do not admit such evidence when it is founded on speculation.
In United States v. Hayden, 85 F.3d 153, 159 (4th Cir. 1996), the Fourth Circuit Court of Appeals held that to be admissible, evidence of threats against the witness must be “(1) ... related to the offense charged and (2) ... reliable.” In United States v. Smith, 629 F.2d 650, 651-52 (10th Cir. 1980), the Tenth Circuit noted: “Evidence of threats to a prosecution witness is admissible as showing consciousness of guilt if a direct connection is established between the defendant and the threat.” (Emphasis added.)
In State v. Marlar, 94 Idaho 803, 498 P.2d 1276, 1281-82 (1972), the Idaho Supreme Court reversed a conviction following the admission of threats against a witness over the telephone, where the prosecution failed to prove that the caller really was the defendant. Id. In United States v. Vaulin, 132 F.3d 898, 900-01 (3d Cir. 1997), the Third Circuit held that threats against the witness, which were never shown to be connected to the defendant, “may have had some highly attenuated, theoretical relevance ... [but t]he probative value is so minimal and the risk of prejudice so certain that it fails [the Rule 403 balancing test].”
In State v. Rogers, 96 S.C. 350, 80 S.E. 620, 620-21 (1914), a conviction was reversed after the trial judge admitted into evidence a letter threatening a witness without any proof the defendant had sent it. The South Carolina Supreme Court later summarized the law on the subject as follows: “References to threats or dangers to witnesses are improper unless evidence is offered connecting the defendant with the threats .... It would be a ‘prostitution of justice’ to permit evidence that someone attempted to influence a witness by fear or fright without any evidence that connects the defendant with the tampering.” Mincey v. State, 314 S.C. 355, 444 S.E.2d 510, 511 (1994) (citations omitted). The error in Mincey—where the prosecutor alleged threats against witnesses without proving them—was so egregious that the reviewing court found defense counsel constitutionally ineffective for failing to object. Id.
[[Image here]]
Finally, in State v. Skinner, 218 N.J. 496, 95 A.3d 236, 238-39 (2014), the New Jersey Supreme Court reversed a conviction based on the erroneous admission of song lyrics. It held:
Fictional forms of inflammatory self-expression, such as poems, musical compositions, and other like writings about bad acts, wrongful acts, or crimes, are not properly evidential unless the writing reveals a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense for which a person is charged, and the probative value of that evidence outweighs its apparent prejudicial impact.

Id.

Jordan v. State, 212 So.3d at 859, 2015 WL 8142708, at **21-22(Fair, J., dissenting).
*828 ¶20. This Court has previously ruled that rap lyrics introduced in a murder trial did not survive a Rule 403 analysis. Brooks v. State, 903 So.2d 691, 699-700 (Miss. 2005). In Brooks, the State introduced rap lyrics written by the defendant extolling murder (with a gun), along with evidence that Brooks had been involved in gang activity, that he had a tattoo of the Grim Reaper holding a pitchfork, and that the defendant’s gang used the symbol of a six-pointed star and a pitchfork as its signs. Id. at 699. The State argued that the evidence was introduced to show identity, because the gang followed the devil, the devil uses a pitchfork, and the victim had been stabbed with a meat fork. Id. The Court found that the trial court did not make a Rule 403 determination on the record, and noted that the rap lyrics made no mention of gangs and discussed murder with a gun, not a fork. Id. at 700. It ultimately reversed the trial court on that issue. Id.
¶ 21. The probative value of Jordan lip-syncing to lyrics as an extra on thirty seconds of a rap video that has no shown connection to the witnesses in this case is slight; indeed, the assertion that any probative value exists at all is tenuous. On the other hand, the danger of unfair prejudice from the introduction of the rap video is high. The rap video is offensive and vulgar. It espouses violence. And the artistic medium is one often misunderstood by jurors. It is clear that under Rule 403, this rap video does not pass muster—its danger of unfair prejudice far outweighs its alleged probative value. Ha4 the trial court viewed the video, this would likely have become apparent, illustrating the importance of examining evidence to be admitted before so admitting. The only other evidence against Jordan aside from the rap video was the testimony of Baker and Smith. The video was mentioned by State witnesses numerous times. Thus, the rap video played a central part of the State’s case against Jordan and was not harmless error and the trial court abused its discretion in admitting the video, as it does not pass Rule 403 muster.

5. Relevance

¶22. Evidence must be relevant to be admissible. M.R.E. 402. Relevant evidence is “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401. The State arguably fails to prove even how the rap video is relevant to Jordan’s case. Given the dearth of connections of the video to Baker and Smith and Jordan’s very slight and somewhat innocuous participation in the video,[8] it is difficult to ascertain how the video is even relevant. Indeed, if participation as an extra for thirty seconds in this rap video is as relevant as the State claims, why then did the State not investigate or charge the other participants in the video in Coleman’s death or for threatening witnesses? If the case for relevance is as lock-step as the State asserts for Jordan’s participation, certainly at least the second star of the video, Chris King, should have been investigated. However, nothing in the record indicates that anyone other than Jordan, Henderson, Baker, and Smith were investigated and prosecuted. The State’s argument that this rap video is relevant to any fact in this case is tenuous at best. Moreover, the trial court’s finding on relevance *829 included the incorrect statement that Jordan was a “star” in the video, as the trial court did not watch the video. Thus, the trial court’s relevance finding was based on an incorrect premise.
CONCLUSION
¶ 23. The trial court did not watch the video at hand, leading to compounding errors in its admission. Because the YouTube video was not properly authenticated, was more prejudicial than probative under Rule 403, and was not relevant, the trial court abused its discretion by admitting the video into evidence, and this Court should reverse Jordan’s convictions and remand the case for a new trial.
DICKINSON, P.J., KITCHENS AND COLEMAN, JJ., JOIN THIS SEPARATE WRITTEN STATEMENT.

. Much of this recitation of the facts is taken from the Court of Appeals’ opinion.

. It also found that other errors raised by Jordan were without merit.

. The State seems to assert that ‘'contemporaneous” means "immediate,” In fact, "contemporaneous” means "existing or happening during the same time period," Contemporaneous, Merriam Webster, http://www.merriam-webster.com/dictionary/contemporaneous (last visited December 12, 2016).

. Indeed, despite its opinion in Jordan’s case, the Court of Appeals now appears to agree that Jordan was not a “star” of the video. In Henderson’s case, the Court of Appeals stated that the video " ‘starred’ Henderson and another rapper; Jordan had a small part” and that the video was “featuring Henderson and another rapper, with Henderson’s brother, Jordan, and others having smaller parts." Henderson v. State, 2016 WL 3512507, No. 2015-KA-00164-COA, at **2, 3 (Miss. Ct. App. June 26, 2016). The Court of Appeals again noted that “[t]he main rapper is Henderson, but Jordan also appears briefly, in addition to Henderson’s brother and other extras.” Id, at *3. It specifically distinguished *824 Henderson’s case from Jordan’s because Henderson was the "lead performer” and Jordan “only had a minor role.” Id. at *3 n.5.

. The State does not assert that Jordan wrote the lyrics.

. See Viacom Int'l Inc. v. YouTube, Inc., 676 F.3d 19, 32 (2d Cir. 2012) (noting that surveys had found that significant percentages—between 80 and 50 percent—of videos on YouTube contained material published or republished without the permission of the copyright holder).

. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person’s character in order to show that on a particular occasion the person acted in accordance with the character.” M.R.E. 404(b)(1). It is admissible, however, for other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.” M.R.E. 404(b)(2). Rule 404(b) triggers a Rule 403 analysis. Brooks v. State, 903 So.2d 691, 699-700 (Miss. 2005). Rule 404(b) evidence must be relevant to prove a material issue other than the defendant's character and its probative value must outweigh the prejudicial effect. Id.

. "From the parts [of the video] where Jordan appears, it is arguable whether he necessarily knew the song was about a police informant and not just an unspecified betrayal by a friend." Jordan v. State, 212 So.3d at 853, 2015 WL 8142708, at *16 (Fair, J., dissenting).