## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2018-KA-00122-COA

MICHAEL GREENE A/K/A MICHAEL                    APPELLANT
JAVONNE GREENE

v.

STATE OF MISSISSIPPI                                      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 12/21/2017 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., TINDELL AND McCARTY, JJ.

### McCARTY, J., FOR THE COURT:

¶1. Michael Greene was convicted of possession of a firearm by a felon after a traffic checkpoint that led to the discovery of a gun on the floorboard of the car he was driving. At trial, the State firmly tied the weapon to Greene through the testimony of the officer on the scene, who saw it pinned beneath the defendant's left foot. The State also attempted to connect the weapon to the defendant through the use of a photograph and a video found on Facebook.

¶2. On appeal, Greene argues that the trial court should have suppressed the internet-

based evidence presented against him, as it was not properly authenticated. While the evidence should have been excluded under our rules of evidence, its admission was harmless error in light of the properly admitted eyewitness testimony presented at trial. As a result, we affirm.

**FACTS**

¶3.     Greene was driving a Pontiac when he was stopped at an administrative checkpoint. Officer Brandon Caston, a patrolman for the Jackson Police Department, was in charge of the checkpoint. According to the officer, "[t]he purpose of the check point was to check driver's licenses and proof of insurance."

¶4.     When Greene drove up, Officer Caston asked for his driver's license and proof of insurance. Greene did not have either and could not produce any form of photo identification. Officer Caston noticed Greene's left foot perched on top of a gun featuring an extended clip.

¶5.     Officer Caston asked Greene to turn the Pontiac off and step out of the vehicle. Officer Caston retrieved the handgun, a 9 mm, and cleared a round from the chamber before securing the weapon in the back of the patrol car. He told Greene that he was going to run the gun through the system. Greene asked, "[O]nce you run my gun and it comes back clear, are you gone let me go?"

¶6.     No record of the gun was found, but the Pontiac's tag connected the car and its contents to Greene. Office Caston asked Greene for his MDOC[1] number—and Greene

---

[1] MDOC stands for the Mississippi Department of Corrections.

immediately answered. Armed with knowledge that the driver, who had no identification and no insurance, was likely a felon in possession of a weapon, Officer Caston reached for his handcuffs.

¶7. Greene made a break for it and hopped out of the Pontiac on the passenger's side. Officer Caston tried in vain to snag the suspect, but Greene eluded capture.

¶8. Greene was later arrested and brought to trial in the Hinds County Circuit Court. At trial, Officer Caston positively identified Greene in the courtroom. He also gave a specific description of Greene as he appeared on the day of the traffic stop—"brown skin, slim male, [with] reddish color twist hair . . . and tattoos."

¶9. At trial, the State attempted to link the gun found in the Pontiac to Greene through a photograph taken from a Facebook account. The State also wanted to introduce into evidence a video allegedly taken of Greene shortly after the checkpoint stop. Neither piece of evidence was from Michael Greene's account; instead, the account belonged to "Mike King."

¶10. The murky photograph, uploaded almost a month prior to the traffic checkpoint, was a close-up of a face; the photograph was dark, and the face was obscured by a box of 9 mm ammunition. The video was clearer, and it included a rambling discourse by the speaker—alleged to be Greene—about how he felt having his car and gun taken from him.

¶11. The photo and video were not produced in discovery. Instead, the State informed the trial court the morning of trial that it wished to offer both into evidence. Greene's trial counsel argued that the untimely submission should automatically result in the exclusion of

evidence and that it should be suppressed for lack of authenticity. Defense counsel emphasized that the Facebook page from which the photograph and video were obtained listed "Mike King" as the profile, not Michael Greene.

¶12. The State's rebuttal was that the evidence was only discovered at 1:00 a.m. the morning before trial. The State further noted that the evidence had been publicly posted for over a year, and was therefore accessible to Greene. Regarding authenticity, the State asserted that it would be able to authenticate the internet evidence through the testimony of Jackson Police Department Detective Jerry Shoulders, the detective in charge of the case.

¶13. The trial court determined that the Facebook evidence was admissible, and denied Greene's motion to suppress. The jury found Greene guilty of possession of a firearm by a felon. Because Greene had prior felony convictions, the trial court sentenced him to ten years as a habitual offender without the possibility of reduction, suspension, or parole.

**DISCUSSION**

¶14. On appeal, Greene raises only one issue—that the trial court erred in admitting the Facebook evidence, as it was unauthenticated.

¶15. Admission of the evidence is reviewed using an abuse-of-discretion standard. *Young v. Guild* (*Guild*), 7 So. 3d 251, 262 (¶34) (Miss. 2009). Further, a conviction will not be reversed on appeal unless the trial court abused its discretion in such a manner that resulted in prejudice to the defendant. *Sewell v. State*, 721 So. 2d 129, 138 (¶50) (Miss. 1998). Prejudice is determined using a harmless-error analysis. *Young v. State* (*Young*), 99 So. 3d 159, 165 (¶20) (Miss. 2012). "Thus, where it is 'clear beyond a reasonable doubt that the

4

error did not contribute to the verdict,' we need not reverse the conviction.'" *Smith v. State*, 136 So. 3d 424 (¶27) (Miss. 2014).

¶16.     Before evidence can be submitted to the jury, a party must present a prima facie case of authenticity. *Guild*, 7 So. 3d at 262 (¶36).  Authenticity of the evidence is governed by Rule 901 of the Mississippi Rules of Evidence.  *Id.*  Rule 901(a) states that authenticity is satisfied by "the proponent . . . produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is."  M.R.E. 901(a).  The rule further provides a non-exhaustive list of authentication methods, including nine core methods, and a tenth "catch-all" method.  4 Jeffrey Jackson & Mary Miller, *Encyclopedia of Mississippi Law* § 33:123, at 776 (2016).

¶17.     The nine core methods of authentication are: (1) testimony of a witness with knowledge; (2) nonexpert opinion about handwriting; (3) comparison by an expert witness or the trier of fact; (4) distinctive characteristics and the like; (5) opinion about a vice; (6) evidence about a telephone conversation; (7) evidence about public records; (8) evidence about ancient documents or data compilations; and (9) evidence about a process or system. M.R.E. 901(b).  The tenth is any method provided by our Constitution or Supreme Court. *Id.*

¶18.     In regard to more modern forms of electronic evidence, such as email and social media posts, the Supreme Court has taken into consideration that "electronic evidence may be authenticated by the traditional means, and is adequately covered by the current rules of evidence." *Smith*, 136 So. 3d at 432 (¶18).  "However, the circumstantial evidence that tends

5

to authenticate a communication is somewhat unique to each medium." *Id.*

¶19.    "The authentication of social media poses unique issues regarding what is required to make a prima facie showing that the matter is what the proponent claims." *Id*. at (¶19). Since "[c]reating a Facebook account is easy," the proponent of certain internet-based evidence must provide "something more" in order "to adequately present a prima facie case of authentication." *Id*. at (¶¶18, 21). "Because of the special concerns regarding fabrication, the fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communications." *Id.* at 433 (¶20). A heightened level of authentication is required for electronic evidence in order to satisfy the trial court that the factfinders will receive reliable evidence. *Id.* at (¶21).

¶20.    There are several factors that can support authentication. Some of these are through admission or eyewitness testimony, as when "the purported sender admits authorship [or] the purported sender is seen composing the communication . . . . " *Id.* Others are through the admission of records, like when "business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone . . . ." *Id.* The Court also acknowledged that pattern or circumstantial evidence could provide identifying markers, such as when "the communication contains information that only the purported sender could be expected to know, the purported sender responds to an exchange in such a

6

way as to indicate circumstantially that he was in fact the author of the communication, or other circumstances peculiar to the particular case." *Id.*

¶21. The Court rejected the proffer of evidence in *Smith*, finding that "the State failed to provide evidence sufficient to support a finding that the Facebook messages from Smith were what the State claimed." *Id.* at 434 (¶24). "The State failed to make a prima facie case that the Facebook profile from which the messages came belonged to Smith because the only information tying the Facebook account to Smith was that the messages purported to be from a 'Scott Smith' and were accompanied by a very small, grainy, low-quality photograph that we can only assume purported to be Smith." *Id.* "No other identifying information from the Facebook profile, such as date of birth, interests, hometown, or the like, was provided." *Id.* As a result, the Court held that the evidence should have been excluded. *Id*. at 435 (¶26).

¶22. We are faced with a similar situation today. Greene argues that admission of the Facebook evidence was improper due to the State's failure to properly authenticate through either traditional or modern means of authentication.

¶23. Through the testimony of a detective, the State attempted to authenticate the two pieces of evidence under traditional means by simply saying that the person was who it was claimed to be. The State did not use Officer Caston, who conducted the checkpoint stop, to identify the defendant in the Facebook posts or to authenticate the evidence.

¶24. Instead, the State used Detective Jerry Shoulders of the Jackson Police Department in order to authenticate the internet evidence. Detective Shoulders admitted that he did not know Greene, and he was not a witness to the traffic stop. Further, the record does not

indicate that Detective Shoulders ever physically saw Greene prior to the court proceeding to identify him through "distinctive characteristics and the like" as he purported to do during trial.

¶25.   The detective testified that he became involved with Greene's case when he received Officer Caston's reports.   After reviewing these reports, Detective Shoulders filed an affidavit and requested the court to issue a bench warrant for Greene's arrest.  He explained that on the day of trial he was "called to the district attorney's office . . . to, basically, look at this Facebook incident."  He admitted the Facebook page was under the name of "Mike King," but he believed this could be an alias for Greene.  When asked how he knew that the page and subsequent picture and video belonged to Greene, Detective Shoulders stated that "[h]is face is on it" (referring to Greene).

¶26.   The State's argument both at trial and before this Court relies heavily on the avenue of authentication using traditional methods.  More specifically, the State looked to Rule 901(b)(1) and (4): "[T]estimony of a Witness with Knowledge," and "Distinctive Characteristics and the Like."  While the State is correct that this could be applicable, it failed to use a "witness with knowledge."  The State failed to properly authenticate the internet evidence using traditional means.

¶27.   Greene urges that the traditional means were not applicable in any event, and the Supreme Court's modern means of authentication set out in *Smith* should be used because the evidence was from an internet source and was not found under Greene's name.  Under this method the authentication of the evidence fails as well.  At trial, Detective Shoulders

proffered that he was very familiar with Facebook, which supported his claim that he knew the photograph and video were probative due to their time stamps. Likewise, he based his in-court identification of Greene on the content of the page belonging to "Mike King." Yet as the Supreme Court held in *Smith*, electronic evidence presents an authentication concern "because anyone can establish a fictitious profile under any name . . . " and "a person may gain access to another person's account . . . ." *Smith*, 136 So. 3d at 433 (¶19) (citation omitted). During cross examination, Detective Shoulders was questioned about whether he had applied any of the methods to authenticate under *Smith*. The detective admitted that he did not consult any "other independent information" outside of the Facebook page, observe Greene personally making or posting the Facebook posts, or talk to anyone who may have observed Greene doing so. Likewise, the State did not produce phone or computer records connecting Greene to the posts on the "Mike King" account, or a computer expert or any Facebook employee to verify the posts' origins.

¶28. Although Detective Shoulders noted that the Facebook live video contained a date and time stamp consistent with the day after the traffic stop, as well as a black male with similar tattoos to Greene, this is not enough under *Smith*. Old photos and videos can be posted at any time on Facebook and given different dates and times. While it could have importance, absolute reliance upon a timestamp is not sufficient to establish the authenticity of materials from the internet. Because "something more" than this is needed under *Smith*, the evidence should have been excluded. Since the State failed to authenticate the evidence using either traditional means or the modern *Smith* path, the trial court abused its discretion in admitting

the Facebook posts.

¶29.    Yet the legal reality that the evidence should not have been admitted does not end our analysis.  A conviction will not be set aside unless it is "clear beyond a reasonable doubt that the error did not contribute to the verdict."  *Id.* at 435 (¶27).  In *Smith*, the wrongful admission of the evidence did not change the result because there was "overwhelming evidence of guilt . . . ."  *Id.* at 436 (¶28).  The evidence of Greene's guilt of possession of a firearm by a felon is likewise glaring.  The testimony of Officer Caston, the officer conducting the stop, revealed the 9 mm gun's close proximity to Greene, which was slid carefully beneath his left foot.  The officer further testified that Greene asked for the gun to be given back, since the defendant "asked if the gun came back . . . clean, I would let him go."  It is likewise undisputed that Greene was a felon during this entire incident.

¶30.    The jury was also instructed with definitions for both constructive and actual possession—either of which would have been satisfied with the officer's testimony.  Furthermore, the record notes inconsistencies in the testimony of Greene's witnesses, his mother and girlfriend.  A reasonable jury could have found that Greene was in fact guilty of possession of a firearm despite the Facebook evidence.  Despite the presence of the improper internet evidence, its admission did not prejudice the defendant, and it is clear beyond a reasonable doubt that the error did not contribute to the verdict.

## CONCLUSION

¶31.    The trial court improperly admitted the Facebook evidence.  The State failed to properly authenticate the Facebook evidence through modern or traditional means, as it did

10

not have an authenticating witness. Despite this incorrect admission of evidence, Greene was not prejudiced due to the overwhelming evidence arrayed against him at trial.

¶32. **AFFIRMED.**

**BARNES, C.J., WESTBROOKS, TINDELL, McDONALD AND LAWRENCE, JJ., CONCUR. GREENLEE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., GREENLEE AND C. WILSON, JJ.**

**J. WILSON, P.J., CONCURRING IN RESULT ONLY:**

¶33. It is now common for parties to seek to introduce evidence found on Facebook or other social media, and we should try to make the law governing the authentication of such evidence as clear as possible. Depending on what the evidence purports to be and what it is offered to prove, the authentication of this type of evidence can raise unique and challenging issues. However, the issues in this case require only a straightforward application of basic principles of authentication. There was sufficient evidence for a reasonable jury to find that the video and photo were what they purported to be. Therefore, the trial judge committed no abuse of discretion by admitting them into evidence. Greene's conviction should be affirmed for that reason.

¶34. Under Rule 901(a) of the Mississippi Rules of Evidence, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence *sufficient to support a finding* that the item is what the proponent claims it is." M.R.E. 901(a) (emphasis added). Thus, "it is the jury who will ultimately determine the authenticity of the evidence, *not the court*." *Young v. Guild*, 7 So. 3d 251, 262 (¶36) (Miss. 2009) (emphasis

added). For evidence to be admissible, its proponent need only produce some "substantial evidence from which [the jury] could infer [authenticity]." *Id.*

¶35. Authenticity is a preliminary question of admissibility under Rule 104. *See* M.R.E. 104; *Ragin v. State*, 724 So. 3d 901, 903 (¶7) (Miss. 1998); *Stromas v. State*, 618 So. 2d 116, 119 (Miss. 1993). Under Rule 104, the trial judge "must decide any preliminary question about whether . . . evidence is admissible." M.R.E. 104(a). Similar to Rule 901(a), Rule 104(b) provides that if "the relevance of evidence depends on whether a fact exists," the proponent need only provide evidence "*sufficient to support a finding* that the fact does exist." M.R.E. 104(b) (emphasis added). Under Rule 104, the trial judge is *not* required to "find[] that the Government has proved the conditional fact by a preponderance of the evidence." *Roberson v. State*, 199 So. 3d 660, 668 (¶34) (Miss. 2016) (quoting *Huddleston v. United States*, 485 U.S. 681, 690-91 (1988)). Rather, the trial judge "simply examines all the evidence and decides *whether the jury could reasonably find* the conditional fact—here, [that the evidence is what it purports to be]—by a preponderance of the evidence." *Id.* (emphasis added) (quoting *Huddleston*, 485 U.S. at 690-91)).[2] As one federal appellate court has observed, Rule 901(a)'s requirement of authenticity "does not erect a particularly high

---

[2] *See also Lomax v. State*, 192 So. 3d 975, 987 (¶¶63-64) (Miss. 2016) (Kitchens, J., concurring in part and in result) ("[U]nder Rule 104(b) the trial court is not permitted to make the preliminary fact finding. On the contrary, the trial court's role is limited to determining whether there is sufficient evidence to enable the jury to find that the fact existed."); Parham Williams, *Mississippi Evidence* § 9.02, at 9-4 (2015 ed.) ("The trial judge is not permitted or required to determine authenticity by the preponderance of the evidence standard; rather, her empowerment is limited. She may determine only that the foundation evidence is sufficient to support the required finding by the jury. . . . Ultimately, the jury must make the final determination that the item is authentic.").

hurdle. If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury." *United States v. Ortiz*, 966 F.2d 707, 716 (1st Cir. 1992).

¶36. Moreover, evidence may be authenticated under Rule 901 in a variety of ways. The proponent need only "produce evidence" of some nature that is "sufficient to support a finding that the item is what the proponent claims it is." M.R.E. 901(a). Rule 901 gives ten "examples" of accepted ways to authenticate evidence, but the rule also makes clear that these are "examples only" and "not a complete list" of the permissible methods of authentication. M.R.E. 901(b). As examples, the rule states that evidence may be authenticated through the testimony of a witness with knowledge that the evidence is what it purports to be. M.R.E. 901(b)(1). An item of evidence may also be authenticated based on its "distinctive characteristics," such as its "appearance" and "substance," "taken together with all the circumstances." M.R.E. 901(b)(4); *see also Boyd v. State*, 175 So. 3d 1, 6-7 (¶¶20-22) (Miss. 2015) (holding that "peculiar circumstances" may provide sufficient circumstantial evidence of authenticity).

¶37. Appellate review of a trial judge's ruling on an authenticity objection is highly deferential. "Whether the evidence presented satisfies [the authenticity requirement of] Rule[] 901 of the Mississippi Rules of Evidence is a matter left to the discretion of the trial judge. His decision will be upheld unless it can be shown that he abused his discretion." *Ragin*, 724 So. 3d at 903 (¶7) (citing M.R.E. 104(a); *Stromas*, 618 So. 2d at 119). Thus, as an appellate court, we give deference to the trial judge's finding that there was evidence

13

minimally "sufficient to support a finding that the item is what the proponent claims it is." M.R.E. 901(a).

¶38. In addressing the authenticity of the video and photo at issue in this appeal, it is important to be clear about what the evidence purports to be and why it is relevant. The video purports to show Greene making incriminating statements the day after his alleged offense. In a "Facebook Live" video from October 16, 2016, Greene complains bitterly about "the police" and "Jackson" and eventually states, "They took everything I got, my car, my gun with the extendo . . . ." Detective Jerry Shoulders explained that an "extendo" is an "extended magazine for a gun." Shoulders also testified that he was familiar with Facebook and Facebook Live and how they work. He testified that a Facebook Live video is streamed live on the date shown on Facebook—here, October 16, 2016. Finally, Shoulders testified that the man in the video was Greene. Shoulders's identification was probably unnecessary because the video is clear and focuses closely on the subject's face for over twenty minutes, so the trial judge and the jurors could decide for themselves whether the man was Greene. The statements that Greene made on the video are highly relevant and incriminating because he was charged with possessing a gun—specifically, a nine millimeter handgun with an extended magazine—on October 15, 2016. In addition, the evidence showed that the police took possession of the gun and Greene's car on that date—i.e., the day before the video was live-streamed on Facebook. Based on the video itself and Detective Shoulders's testimony, there was sufficient evidence for a reasonable jury to find that the video is what it purports to be: a video of Greene on October 16, 2016. Therefore, the trial judge did not abuse his

14

discretion by overruling Greene's authenticity objection.

¶39. Detective Shoulders testified that the purported photo of Greene with a box of nine millimeter ammunition was also posted to Facebook. The images that were introduced into evidence at trial—a printout of the Facebook page and a larger blow-up of the photo—are not professional quality, and Greene's face is partially obscured by the box of ammunition. However, the images are of sufficient quality for reasonable jurors to find that Greene is the man shown. The photo was posted to Facebook on September 19, 2016—i.e., about a month before the offense. We do not know the date that the photo was taken—only that it was taken on or before September 19, 2016. Nonetheless, there was sufficient evidence for the jury to reasonably find that the photo is all that it purports to be: a photo of Greene holding a box of nine millimeter ammunition on or before September 19, 2016. The fact that Greene had bullets for the gun he was charged with possessing is at least marginally relevant, even if there was no evidence of the exact date on which the photo was taken.[3] Therefore, the trial judge did not abuse his discretion by overruling Greene's objection.

¶40. In finding an abuse of discretion, the majority opinion relies exclusively on *Smith v. State*, 136 So. 3d 424 (Miss. 2014). However, *Smith* addressed the authenticity of "Facebook messages," which raise issues significantly different than the photo and video in this case. In *Smith*, the defendant (Scott Smith) argued "that the trial court erred in admitting several Facebook messages into evidence" without proper authentication. *Id.* at 426 (¶1). In

---

[3] *See* M.R.E. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case."); *Ross v. State*, 954 So. 2d 968, 993 (¶44) (Miss. 2007) ("Rule 401 is construed broadly in favor of admitting evidence with even slight probative value.").

addressing that claim, the Supreme Court emphasized that "anyone can create a fictitious account and masquerade under another person's name or can gain access to another's account by obtaining the user's username and password." *Id.* at 432 (¶19) (quoting *Griffin v. State*, 19 A.3d 415, 421 (Md. 2011)). The Court ultimately held that "the State failed to provide evidence sufficient to support a finding that the Facebook messages . . . were what the State claimed" because it not only "failed to make a prima facie case that the Facebook profile from which the messages came belonged to Smith" but also "failed to make a prima facie case that the messages were actually sent by Smith." *Id.* at 434 (¶¶24-25). The Facebook profile purported to belong to a "Scott Smith," but it included "[n]o other identifying information . . . , such as date of birth, interests, hometown, or the like." *Id.* at 434 (¶24). Moreover, the profile included only "a very small, grainy, low-quality photograph," and there was no testimony or other evidence that the man in the photo was Smith. *Id.* at (¶24) & n.14. Finally, although a witness testified that the profile belonged to Smith and that Smith sent the messages at issue, "the State utterly failed to provide any information as to the basis of her purported knowledge." *Id.* at (¶25). Thus, the Supreme Court held that the trial court "abused its discretion by admitting the Facebook messages purporting to be from Smith's account, because these messages were not properly authenticated." *Id.* at 435 (¶26).

¶41.    The issues in this case are quite different from the issue in *Smith*. In the present case, it is unimportant whether the Facebook profile belonged to Greene or whether Greene personally posted the evidence to Facebook.[4] The video is relevant simply because there is

---

[4] The fact that the video was streamed live indicates that Greene at least had access to the account.

16

sufficient evidence for the jury to find that it is a video of Greene—and that is true regardless of whether the Facebook profile was Greene's. Likewise, the photo of Greene is relevant simply because the jury could reasonably find that it is a photo of Greene—and, again, that is true regardless of who owned the Facebook profile or posted the photo.

¶42. When he overruled Greene's authenticity objection, the trial judge cited this Court's decision in *Jordan v. State*, 212 So. 3d 836, 845 (¶¶38-39) (Miss. Ct. App. 2015), *aff'd by an equally divided Court*, 212 So. 3d 817 (Miss. 2016), *cert. denied*, 138 S. Ct. 151 (2017). In *Jordan*, this Court held that a video posted on YouTube was sufficiently authenticated by a law enforcement officer's testimony that he recognized the defendant in the video and then downloaded a copy of the video onto a disc. *Id.* at (¶38). We held that the officer "had sufficient knowledge to authenticate that the video was what the State claimed it to be—a video published on YouTube featuring [the defendant and a co-defendant]." *Id.* The defendant argued that the officer's testimony "was insufficient because he did not know when the video was made, who produced it, or when it was published on the internet," but we held that such "challenges went to the issues of the reliability and weight of the video, not its authentication." *Id.* at (¶39).[5] The trial judge in this case properly relied on *Jordan*, as it raised a similar issue of authentication that did not depend on the person responsible for posting the evidence on the internet.

---

[5] *See also Henderson v. State*, 211 So. 3d 761, 765 n.5 (Miss. Ct. App. 2016) (noting the same in the co-defendant's appeal), *cert. denied*, 209 So. 3d 432 (Miss. 2017); *State v. Gray*, No. 2016-KA-1195, 2017 WL 3426021, at *15-*16 (La. Ct. June 28, 2017), *writ denied*, 257 So. 3d 688 (La. 2018) (following *Jordan* and holding that there was "sufficient support for the [trial] court's finding that . . . YouTube videos were what the State claimed them to be—videos posted on YouTube depicting [the defendant and others]").

¶43. In summary, there was sufficient evidence to support a finding that the evidence was what it purported to be: a live-streamed video of Greene and a photo of Greene. That is all that Rule 901 requires. Moreover, short of Greene getting on the stand and admitting to the authenticity of the video and photo, I am not sure what else the State could have done to authenticate them. The trial judge did not abuse his discretion in admitting the evidence. I would affirm Greene's conviction for that reason.

**CARLTON, P.J., GREENLEE AND C. WILSON, JJ., JOIN THIS OPINION.**